ATTORNEY GENERAL v PUBLIC SERVICE COMMISSION

Docket No. 112586. Submitted June 4, 1990, at Lansing. Decided May 7, 1991, at 9:05 A.M.

The Attorney General brought an action in the Ingham Circuit Court against the Public Service Commission, alleging that the PSC improperly granted intervening defendant Consumers Power Company financial stabilization rate relief. The court, Peter D. Houk, J., affirmed the PSC's orders which awarded an electric rate increase to ensure the continued solvency of Consumers in the face of the debt incurred in the construction of its Midland Nuclear Power Plant. The Attorney General appealed.

The Court of Appeals *held:*

1. There was competent, material, and substantial evidence on the record to support the PSC's conclusion that the financial stabilization relief was necessary to avoid the inevitable cost of allowing the utility to become insolvent.

2. The PSC has the jurisdiction and the legal authority to set electric rates as requested in a utility's petition or application under § 2 of the transmission of electricity act, MCL 460.552; MSA 22.152, and § 6a of the Public Service Commission act, MCL 460.6a; MSA 22.13(6a).

3. The PSC properly considered the factors set forth in § 7 of the transmission of electricity act, MCL 460.557; MSA 22.157, in setting the utility's rates. The PSC has broad discretion to determine a just and reasonable rate and, within the exercise of that discretion, to determine which factors are relevant. The PSC is not bound by any single formula or combination of formulas, but is free to make pragmatic adjustments warranted by the particular circumstances.

Affirmed.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *Luis F. Fernandez,* Assistant Attorney General, for the plaintiff.

*Don L. Keskey, Henry J. Boynton,* and *Musette*

*A. Michael,* Assistant Attorneys General, for the Public Service Commission.

*Loomis, Ewert, Ederer, Parsley, Davis & Gotting* (by *George W. Loomis, Michael G. Oliva,* and *Ronald W. Bloomberg*), and *David A. Mikelonis* and *H. Richard Chambers,* for the Consumers Power Company.

Amicus Curiae:

*Hill Lewis* (by *Douglas H. West, Roderick S. Coy,* and *Louis J. Porter*), for the Association of Businesses Advocating Tariff Equity.

Before: SAWYER, P.J., and MICHAEL J. KELLY and MURPHY, JJ.

PER CURIAM. Plaintiff appeals as of right from an opinion and order entered by the Ingham Circuit Court which affirmed the March 29 and July 24, 1985, orders of defendant Public Service Commission awarding an electric rate increase to intervening defendant Consumers Power Company in order to ensure the continued solvency of the utility in the face of the debt incurred in the construction of its Midland Nuclear Power Plant. The circuit court reasoned that the costs of the Midland project had not been shifted to Consumers' customers because these costs were expressly eliminated from the rate base calculation in the PSC's Step 1 order issued in 1984. The court also found that § 7 of the transmission of electricity act, MCL 460.551 *et seq.;* MSA 22.151 *et seq.,* authorized the PSC to consider the risks of business and the value of service to customers as independent bases for the financial stabilization rate increase, regardless of the fact that the utility's

financial troubles were caused by its Midland
plant investment. We affirm.

Consumers commenced this utility rate proceed-
ing by applying for authority to increase its rates
for the sale of electricity in three steps: Step 1,
interim rate relief of $192,723,000 annually; Step
2, final rate relief of an additional $19,637,000
annually, based on a projected 1985 test year; and
Step 3, additional rate relief in the annual amount
of $564,252,000 to reflect the ratemaking effect of
the future commercial operation of its Midland
Unit No. 2. While these proceedings were pending,
Consumers cancelled construction of the Midland
Nuclear Power Plant. Subsequently, Consumers
amended its rate relief application by revising its
Step 3 request to reflect the cessation of construc-
tion at Midland. Step 1 of the proceedings was
completed when the PSC awarded Consumers par-
tial and immediate rate relief in the amount of
$137,023,000 annually. In that order, the PSC rec-
ognized that the cancelled Midland project could
no longer be considered construction work in prog-
ress and, therefore, eliminated Midland project
expenses from the rate base and cost of service
calculations for the 1985 test year.

Thereafter, the PSC interrupted its consideration
of Step 2 of Consumers' rate relief request and
immediately proceeded to Step 3 by dividing that
inquiry into two steps: Step 3A, Consumers' re-
quest for prompt financial stabilization rate relief
in the amount of $205 million annually in order to
remedy the financial distress caused by debt re-
lated to the Midland project; and Step 3B, consid-
eration of the rate treatment of Consumers' re-
quest for recovery of its investment in the Midland
plant project in view of the reasonableness and
prudence of the project's expenditures. The pres-
ent appeal involves the disposition of the Step 3A

proceedings only. The Step 3B proceedings are still pending before the PSC.

Following exhaustive hearings on the question of financial stabilization or cash-flow relief, the PSC entered its March 29, 1985, opinion and order. Consumers' request for a $205 million rate increase was denied because it would place the largest portion of the burden of improving the utility's financial condition on its ratepayers. However, the PSC also found that Consumers' approximately $1.9 billion in bank debt and other obligations arising out of the Midland project impaired the utility's ability to finance its seasonal fuel and gas inventories or to develop new generating capacity for future energy demands and threatened to send the company into bankruptcy. The PSC concluded that a rate increase of $99 million annually for a period of six years, conditioned upon Consumers' compliance with strict cost-cutting and debt-restructuring measures, was the option with the least total cost and the greatest benefit to the ratepaying public. The PSC reasoned that requiring Consumers to absorb the total cost of restoring the utility to financial health would inevitably impair both Consumers' ability to serve its customers and, ultimately, the growth of the state economy. Citing its authority under § 7 of the transmission of electricity act, MCL 460.557; MSA 22.157, to consider the value of service to the customer as a factor in setting electric rates, the PSC granted a rate increase of $594 million over a six-year period, predicated upon twelve express conditions involving various cost-cutting and debt-restructuring measures.

In the July 24, 1985, opinion and order, the PSC found that Consumers had complied with the twelve conditions of its previous order and authorized the rate increase, subject to offset for the

proceeds from the sale of the Midland project's nuclear fuel for a total rate increase of $564 million over six years, or $94 million annually. The PSC later reduced the annual amount of the rate increase to approximately $90 million per year to reflect the proceeds of the sale of certain salvage from the Midland project and, ultimately, to $79 million annually in 1988. Additionally, the approximately $435 million in surcharge rates received by Consumers would be set off against any relief awarded under Step 3B.

The standard by which this Court reviews decisions of the Public Service Commission is whether they are reasonable and lawful. Rates set by the PSC are presumed to be lawful and reasonable. MCL 462.25; MSA 22.44. The challenger has the burden of proving by clear and satisfactory evidence that the PSC's order is unlawful or unreasonable. MCL 462.26; MSA 22.45; *Attorney General v Michigan Public Service Comm,* 122 Mich App 777, 796-797; 333 NW2d 131 (1983). Moreover, it must be shown that the PSC's findings of fact were not supported by competent, material, and substantial evidence. Const 1963, art 6, § 28; *Consumers Power Co v Public Service Comm,* 181 Mich App 261, 266; 448 NW2d 806 (1989). The reviewing court must give due deference to the PSC's administrative expertise and is not to substitute its judgment for that of the commission. *General Motors Corp v Public Service Comm No 2,* 175 Mich App 584, 589; 438 NW2d 616 (1988).

I

The Attorney General argues that the Step 3A financial stabilization rate increase is unlawful because it improperly shifted the cost of the abandoned Midland Nuclear Power Plant from Con-

sumers' investors to its ratepayers in contravention of Michigan's regulatory scheme. Citing *Attorney General v Michigan Public Service Comm,* 412 Mich 385; 316 NW2d 187 (1982), the Attorney General contends that this state's utility regulation system does not provide for the recovery of costs incurred in the construction of unused power plants. We disagree.

We have reviewed the Supreme Court's opinion and conclude that plaintiff's reliance is misplaced. The Supreme Court considered only the scope of inquiry by the PSC when a public utility requests authorization to issue securities to finance a new power plant. In addressing the concern that the failure to inquire into a project's reasonableness before authorizing the issuance of securities would force ratepayers to bear the costs of failed projects, the Court recognized that such costs may be excluded, in whole or in part, from a utility's rate base if they are found to be unreasonable. *Id.,* 410-428. The opinion does not, as the Attorney General argues, suggest that all costs associated with an abandoned plant are unreasonable per se or that a utility may not recover its reasonable and prudent investment in an unused plant.

Moreover, plaintiff's argument is premature because the commission delayed consideration of the reasonableness and recoverability of Consumers' Midland project cost until Step 3B of the proceedings. By contrast, the Step 3A proceeding was not concerned with the utility's recovery of its investment in new generating capacity. Rather, it separately addressed the financial distress caused by the utility's investment in the Midland project and the resultant threat to the utility, its existing and future customers, other utilities, the state economy, and the continued regulatory authority of the commission itself. The commission essentially

found that the financial stabilization relief was necessary to avoid the inevitable "cost" of allowing the utility to become insolvent. There was competent, material, and substantial evidence on the record to support this conclusion.

## II

Next, plaintiff argues that the grant of a rate increase for financial stabilization was unlawful because the PSC relied on the factors set forth in § 7 of the transmission of electricity act, MCL 460.557; MSA 22.157. According to plaintiff, § 7 only gives the PSC authority to grant a rate increase to a utility when a utility consumer, city, village, or township files a complaint. Plaintiff relies on *Union Carbide v Public Service Comm*, 431 Mich 135, 161-162; 428 NW2d 322 (1988), in which the Supreme Court held that the PSC's investigatory and remedial powers pursuant to § 7 must be initiated by the written complaint of a consumer or a city. Nevertheless, we conclude that the PSC clearly has jurisdiction and legal authority to set electric rates pursuant to a utility's petition and may properly consider the factors set forth in § 7 in setting those rates.

The PSC has broad authority to regulate public utilities and their rates. However, the commission possesses no common-law powers. Rather, as a creature of statute, it has only statutory authority. *Id.,* 146. Thus, a determination of the commission's powers requires an examination of the various statutory enactments pertaining to its authority, specifically, the Public Service Commission act, MCL 460.1 *et seq.*; MSA 22.13(1) *et seq.*, the Public Utilities Commission act, MCL 460.51 *et seq.*; MSA 22.1 *et seq.*, the Railroad Commission act, MCL 462.2 *et seq.*; MSA 22.21 *et seq.*, and the transmis-

sion of electricity act, MCL 460.551 *et seq.*; MSA 22.151 *et seq.* See also *Union Carbide, supra,* 146-162.

Section 6(1) of the Public Service Commission act, MCL 460.6(1); MSA 22.13(6)(1), provides:

> The public service commission is vested with complete power and jurisdiction to regulate all public utilities in the state except a municipally owned utility, the owner of a renewable resource power production facility as provided in section 6d, and except as otherwise restricted by law. The public service commission is vested with the power and jurisdiction to regulate all rates, fares, fees, charges, services, rules, conditions of service, and all other matters pertaining to the formation, operation, or direction of such public utilities. The public service commission is further granted the power and jurisdiction to hear and pass upon all matters pertaining to, necessary, or incident to the regulation of all public utilities, including electric light and power companies, whether private, corporate, or cooperative, gas companies, water, telephone, telegraph, oil, gas, and pipeline companies, motor carriers, and all public transportation and communication agencies other than railroads and railroad companies.

Although broadly stated, § 6(1) is not a grant of specific power. It is merely an outline of the PSC's jurisdiction. *Union Carbide,* 147; *Huron Portland Cement Co v Public Service Comm,* 351 Mich 255, 263; 88 NW2d 492 (1958). Therefore, we must find a specific grant of power in another place.

The PSC has authority to grant a rate increase pursuant to a utility's petition or application under § 2 of the transmission of electricity act, MCL 460.552; MSA 22.152, which requires a utility to petition the commission for "authority to initiate or put into force [a] rate or charge" and § 6a of the

Public Service Commission act, MCL 460.6a; MSA
22.13(6a), which sets forth the procedure by which
a utility may obtain a rate increase. By plaintiff's
own admission, the Step 3A financial stabilization
rate relief request was part of a "general rate
case" initiated pursuant to § 6a. Plaintiff alleges
no procedural defect in the proceedings, and our
review of the record reveals none.

However, neither statutory provision sets forth
the standard by which the PSC judges the propriety
of rates set pursuant to a utility petition. Section
6a(2) merely defines a general rate case as a
proceeding "that alleges a revenue deficiency and
requests an increase . . . of rates or charges based
on the utility's total cost of providing service."
Nevertheless, it is well settled that the universal
test of the lawfulness of utility rates is that the
rates be "just and reasonable." *Northern Michigan
Water Co v Public Service Comm,* 381 Mich 340,
351; 161 NW2d 584 (1968). This standard is re-
flected in several sections of the various acts which
give the PSC ratemaking power. See MCL 460.6h(1)
(d); MSA 22.13(6h)(1)(d), MCL 460.54; MSA 22.4,
MCL 460.557; MSA 22.157, MCL 462.22; MSA
22.41, and MCL 462.32; MSA 22.51. In particular,
§ 6h(1)(d) of the Public Service Commission act,
MCL 460.6h(1)(d); MSA 22.13(6h)(1)(d), provides:

> As used in this act:
> "General rate case" means a proceeding before
> the commission in which interested parties are
> given notice and a reasonable opportunity for a
> full and complete hearing on *a utility's total cost
> of service and all other lawful elements properly
> to be considered in determining just and reason-
> able rates.*

At the time of the PSC's decision in this case, the
only express language defining what constitutes

the "lawful elements" that the PSC may consider in setting a just and reasonable rate appeared in § 7 [now § 7(2)] of the transmission of electricity act, MCL 460.557; MSA 22.157, which provided in pertinent part:

> [T]he commission shall consider and give due weight to all lawful elements properly to be considered to enable the commission to determine the . . . price to be fixed for supplying electricity, including cost, reasonable return on the fair value of all property used in the service, depreciation, obsolescence, risks of business, value of service to the consumer, the connected load, the hours of the day when used, and the quantity used each month.

As plaintiff argues, when the PSC granted the financial stabilization relief, it was not acting pursuant to its ratemaking power under § 7 because this proceeding was initiated by the utility, rather than a consumer or a municipality. Nevertheless, once its ratemaking authority was properly invoked by Consumers' petition, the PSC had broad discretion to determine a just and reasonable rate and, within the exercise of that discretion, to determine which factors were relevant. *Detroit v Michigan Public Service Comm,* 308 Mich 706, 717; 14 NW2d 784 (1944); *Consumers Power v Public Service Comm,* 181 Mich App 267.

As previously noted, the factors enumerated in § 7 are the only substantive standard for determining what constitute just and reasonable rates that may be found in any of the four acts empowering the PSC to set utility rates. The Attorney General's suggestion that the commission may consider all of the § 7 factors upon complaint by a consumer or municipality, but may only consider cost of service when a utility petitions for a rate increase is absurd and contrary to the express

language of § 6h(1)(d) of the Public Service Commission act, MCL 460.6h(1)(d); MSA 22.13(6h)(1)(d). The PSC is not bound by any single formula or combination of formulas, but is free to make pragmatic adjustments warranted by the particular circumstances. *Michigan Bell Telephone Co v Public Service Comm*, 332 Mich 7, 36-37; 50 NW2d 826 (1952).

Moreover, we note that as originally enacted, § 7 of the transmission of electricity act controlled rate cases initiated by municipalities or by the utilities themselves and used the identical factors set forth in the statute today. 1909 PA 106, § 7. The act was later amended by 1921 PA 274, which added to § 7 a provision authorizing consumer complaints and moved the utility complaint provision to § 2. Because § 2 contains no standards for determining rates, we must conclude that the Legislature intended that the standards set forth in § 7 would continue to apply in utility-initiated rate cases. The fact that the phrase "all lawful elements properly to be considered in determining just and reasonable rates" was later repeated in § 6h of the Public Service Commission act supports this conclusion. Therefore, we conclude that to the extent that § 7 enumerates a nonexclusive list of the lawful elements which the PSC may properly consider in determining what constitutes just and reasonable electricity rates, the statute provides guidance for the setting of those rates when a utility petitions for a rate increase. The PSC may properly consider those factors, along with any other lawful factors it deems relevant.

In the present case, the PSC in its March 29, 1985, opinion and order found as follows:

The list of factors in the statute [§ 7] does not exhaust but only illustrates the elements which

the Commission must consider. Further, the statute does not adopt nor does it require the Commission to adopt the traditional ratemaking formula regardless of the circumstances of the case. Instead, the statute requires the Commission to "consider and give due weight to all lawful elements."

The Commission believes that it has considered lawful and relevant factors: the need for additional cash flow to meet Consumers' debt and obligations; the need for and methods to promote a debt restructuring; the propriety of cuts in o&m and construction expenditures and the effect of those on Consumers and its ratepayers; the effects of insolvency and bankruptcy on Consumers, its shareholders, its ratepayers and the [S]tate of Michigan; the probability of Consumers remaining financially able to raise new capital under each of the plans available; and the value to Consumers' ratepayers of not having the utility become insolvent. The rate increase established in this case is based on those factors. The resulting rates are therefore just and reasonable and lawful.

We have reviewed the record and conclude that the psc's findings were supported by competent, material, and substantial evidence. We agree with the commission and the circuit court that the relevant factors justified granting Consumers' request for cash-flow relief. The grant of a rate increase for the purpose of financial stabilization was lawful and reasonable.

### III

During the pendency of this appeal, we granted leave to the Attorney General, the Public Service Commission, and the Association of Businesses Advocating Tariff Equity (ABATE), amicus curiae, to

submit supplemental briefs raising additional arguments based on recent developments in proceedings before the PSC, the Ingham Circuit Court, and this Court, which have brought into question the enforceability of the conditions imposed by the PSC in its grant of financial stabilization rate relief to Consumers Power Company. Specifically, a question has been raised in these other proceedings concerning whether the PSC may enforce "Condition 11" of the Step 3A stabilization rate relief orders at issue in the present appeal by directing the manner in which proceeds received from the sale or salvage of the Midland power plant assets may be used.[1] The Attorney General, the PSC, and ABATE all argue that if this Court determines that the PSC could not lawfully impose and enforce conditions on the grant of the financial stabilization rate increase, the entire plan must fail. We believe this question is more appropriately considered in the other cases pending before this Court in which the relevant facts are in the record and the issue of the extent of the PSC's authority to enforce the conditions was properly raised. Therefore, we decline to address the issue at this time.

Affirmed.

---

[1] To make a long story short, in 1985, Condition 11 was adopted to cover whatever value might be left in the Midland plant. The value was unknown, but Condition 11 was drafted partly in terms of salvage value. Subsequently, Consumers hit upon the idea of converting the Midland Nuclear Power Plant into a gas-fired cogeneration facility and obtained the PSC's permission to proceed with this plan. By 1989, the Midland assets were valued in excess of $1 billion. Concerned that the PSC would consider Consumers' return on the cogeneration venture to be "proceeds" under Condition 11, Consumers transferred its interest in the new Midland project to its parent company, CMS Energy Corporation, in exchange for a $1.4 billion debenture. On May 23, 1990, the PSC ordered the cash, equity, and notes from the cogeneration venture to be returned to Consumers as proceeds under Condition 11 to be used "solely for lawful corporate purposes related to securing the financial health of the utility."