CMS ENERGY CORPORATION v ATTORNEY GENERAL

Docket No. 129241. Submitted March 13, 1991, at Lansing. Decided July 9, 1991, at 9:05 A.M.

> Following special proceedings, the Public Service Commission held that the cash, debt, and equity interests acquired by the CMS Energy Corporation from the sale of certain assets of the former Midland nuclear power plant to the Midland Cogeneration Venture Limited belonged to the Consumers Power Company and were proceeds subject to the PSC's authority, pursuant to a 1985 rate order, to determine the proper use of the proceeds.

> In 1985, in order to secure a special rate surcharge, Consumers agreed to a number of conditions, one of which permitted the PSC to specify the proper use of any proceeds realized from the sale or salvage of the Midland power plant. In 1986, Consumers created two subsidiaries, CMS Midland, Inc., and MEC Development Corporation, to carry out a planned conversion of the Midland nuclear power plant into a cogeneration facility. In 1987, Consumers transferred $1.5 billion of the Midland plant assets to CMS Midland and MEC Development for stock in those companies. Also in 1987, Consumers underwent a corporate reorganization whereby the CMS Energy Corporation, an unregulated holding company, was created and Consumers became the principal subsidiary of CMS Energy. In 1988, Consumers created a wholly owned subsidiary, Midland Group, Ltd, and transferred its stock of CMS Midland and MEC Development to Midland Group in exchange for Midland Group stock. In 1990, in anticipation of receiving more than $1 billion in cash and securities from the Midland Cogeneration Venture Limited for the Midland assets, CMS Energy and Consumers authorized the sale to CMS Energy of the stock of CMS Midland and MEC Development held by Midland Group in exchange for a $1.4 billion debenture.

> After finding that debenture was not satisfactory consideration,

REFERENCES

Am Jur 2d, Public Utilities §§ 232, 240.

See the Index to Annotations under Public Service Commissions; Rates and Charges

the PSC disregarded the corporate restructuring and ruled that the proceeds belonged to Consumers and were subject to the 1985 condition regarding the use of the proceeds. The CMS Energy Corporation, the Consumers Power Company, and the various subsidiaries appealed.

The Court of Appeals *held:*

The condition in the 1985 rate order reserving to the PSC the right to direct the use of any proceeds resulting from the sale of the Midland plant did not impermissibly expand the PSC's subject-matter jurisdiction. Consumers agreed to that condition and will not now be heard to complain that the reserving of that right interferes with its right to manage its affairs. The PSC properly found that the securities involved were proceeds within the meaning of the 1985 condition and that those proceeds were indirectly payable to Consumers despite the change in corporate structure and transfer of ownership of the assets and the various subsidiaries.

1. The condition in the 1985 rate order granting Consumers a special rate surcharge did not constitute an improper attempt to expand the subject-matter jurisdiction of the PSC, but was rather a proper exercise of the PSC's subject-matter jurisdiction to fix rates and enforce its own orders. Consumers agreed to the condition and never appealed the 1985 order containing the condition. Accordingly, Consumers may not claim that the condition impermissibly invades the providence of its management.

2. The PSC properly determined that the securities secured for the transfer of the Midland assets were proceeds within the meaning of the 1985 condition.

3. Under the circumstances of this case, the PSC properly disregarded the separate corporate entities for the limited purpose of finding that the proceeds from the transfer of the Midland assets were proceeds received by Consumers within the meaning of the 1985 condition.

4. The 1985 condition relating to the use of proceeds continued in effect despite the fact that Consumers had already eliminated the surcharge rates which had been granted in the 1985 rate order that contained the condition. The fact that the PSC had previously granted Consumers relief from another condition contained in the 1985 rate order did not terminate the condition concerning the use of proceeds.

5. The PSC order requiring that the proceeds be returned by CMS Energy to Consumers did not unconstitutionally impair any contract rights, did not conflict with the federal law that

deals with cogeneration facilities, and did not result in a constitutionally prohibited confiscation of private property.
Affirmed.

Public Utilities — Public Service Commission — Jurisdiction — Subject-Matter Jurisdiction.

The subject-matter jurisdiction of the Public Service Commission is not impermissibly expanded where the commission, in granting extraordinary rate relief to a public utility to cover costs associated with the construction of a production facility, secures from the public utility an agreement that the commission shall have the power to specify the use of the proceeds of any future sale of that facility; acquiescence by the utility in such a condition being placed in the order granting the rate increase precludes the utility from claiming that the condition constitutes an unwarranted interference by the commission with the management of the utility.

*Dykema Gossett* (by *Richard J. McClear* and *Robert J. Franzinger*), and *Loomis, Ewert, Ederer, Parsley, Davis & Gotting* (by *George W. Loomis* and *Michael G. Oliva*), and *David A. Mikelonis* and *James E. Brunner,* Consumers Power Company, for the appellants.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *Luis F. Fernandez* and *Paul F. Novak,* Assistant Attorneys General, for the Attorney General.

*Hill Lewis* (by *Roderick S. Coy, Louis J. Porter,* and *Joseph R. Assenzo*), for Association of Businesses Advocating Tariff Equity.

*Don L. Keskey* and *Henry J. Boynton,* Assistant Attorneys General, for the Michigan Public Service Commission.

Before: Neff, P.J., and Murphy and Marilyn Kelly, JJ.

Per Curiam. Consumers Power Company, a reg-

ulated utility company, its nonregulated corporate parent, CMS Energy Corporation, and certain nonregulated subsidiaries appeal as of right, MCL 462.26; MSA 22.45, from a May 23, 1990, order of the Michigan Public Service Commission. Among other things the PSC found that "proceeds" in the form of cash, debt, and equity received by nonregulated subsidiaries of CMS Energy belonged to Consumers. The PSC ordered the proceeds returned to Consumers, where they would be used to improve Consumers' "financial health." The proceeds were received in exchange for the assets of the unfinished nuclear power plant in Midland that once had been owned by Consumers. The value of the proceeds is in the area of $1.4 to $1.8 billion.

I

The PSC's order enforced an aspect of its March 29, 1985, order in U-7830 Step 3A known as "condition 11":

> (11) Within 45 days of the earlier of receiving, directly or indirectly, any proceeds or notice of the date on which it will receive proceeds from the sale or salvage of the Midland plant, its fuel or related facilities, or from litigation related to their construction or fabrication, Consumers shall file an application specifying how it proposes to use those proceeds. The Commission will schedule a hearing and at the conclusion issue an order specifying the proper use of those funds. Other issues as appropriate may also be addressed in those hearings.

Condition 11 was one of twelve conditions that the PSC required Consumers to agree to in order for Consumers to obtain special rate relief in the form of an annual surcharge. About $434 million was eventually collected by Consumers as a result

of that special rate relief. The authority of the PSC to impose the surcharge was considered in *Attorney General v Public Service Comm,* 189 Mich App 138; 472 NW2d 53 (1991). For purposes of this opinion, it is recognized that the rate surcharge was extraordinary and was granted because of Consumers' dire financial condition caused in large part by the costs of the unfinished Midland nuclear plant.

The PSC was willing to grant Consumers' request for extraordinary rate relief only if Consumers first agreed to twelve conditions. The PSC's March 29, 1985, order required that Consumers' board of directors commit itself "to comply fully with the letter and spirit" of the PSC's order, including the twelve conditions. Consumers' board so agreed by adopting a resolution on or about May 1, 1985. Similar resolutions were adopted in 1986, 1987, 1988, and 1989. The PSC formally granted the rate relief in a July 24, 1985, order, after finding that Consumers had satisfactorily complied with or committed itself to comply with the conditions. The PSC granted the rate increase "subject to Consumers' continued compliance with this order and the Commission's March 29, 1985 order."

In 1986, Consumers decided to convert the then-abandoned Midland nuclear plant into a gas-fired cogeneration plant. Under condition 5 of the 1985 orders, all surcharge rates collected were subject to immediate refund if Consumers was involved in any further construction of the Midland plant. On October 22, 1986, as a part of its consideration of U-7830 Step 3A and 3B and U-8431, the PSC granted relief from condition 5 to the extent Consumers' participation in the conversion project did not involve jurisdictional revenues and involved only assets which would never be the basis for any future rates. Consumers then ceased its efforts in

U-7830 Step 3B for rate relief related to the Midland assets in order to use those assets in the conversion project.

In late 1986, Consumers created two subsidiaries, CMS Midland, Inc., and MEC Development Corporation, to carry out its participation in the conversion project. In January and August of 1987, Consumers conveyed $1.5 billion of Midland assets to these two companies for stock of the companies. In April 1988, Consumers created a wholly owned subsidiary, Midland Group, Ltd. (MGL), and transferred its stock in CMS Midland and MEC Development to the MGL in exchange for the MGL stock. Also, in May 1987, Consumers underwent a corporate reorganization which created CMS Energy as an unregulated holding company, with Consumers its principal subsidiary.

In connection with the expected commercial operation of the conversion project in the spring of 1990, Consumers anticipated receiving more than $1 billion in securities from the Midland Cogeneration Venture Limited Partnership (MCV), which would operate the Midland facility. The securities were in exchange for the Midland assets contributed to the project by Consumers.

On January 3, 1990, the Association of Businesses Advocating Tariff Equity (ABATE) filed a motion/verified complaint requesting the PSC to restrict Consumers' use of the securities until a condition 11 hearing could be conducted to determine their use as "proceeds." ABATE's request was filed in the ongoing compliance hearing (required by condition 10) for 1988. On January 29, 1990, the PSC ordered an expedited hearing to be held on February 21, 1990, with briefs to be filed on March 2 and 9.

On March 8, 1990, the directors of CMS Energy and Consumers met and authorized the MGL (Con-

sumers' subsidiary) to sell its stock in CMS Midland and MEC Development to CMS Energy. CMS Energy would pay for the stock with a $1.4 billion debenture. Among the reasons given for the transaction at the directors' meetings were to "move cash to CMS to fund non-utility business growth," to "insulate cash from confiscation," and because "recent regulatory proposals related to seizure of shareholder assets precipitate action now." William McCormick, chairman of the board of both CMS Energy and Consumers, confirmed in testimony that one of the objectives of the transaction was to avoid regulatory control of the "proceeds" received from the MCV.

The transaction occurred on March 12, 1990. The "proceeds" received, and at issue here, are the cash, notes, and other debt and equity interests exchanged by the MCV for the Midland plant assets contributed to the conversion project. These "proceeds" went to the subsidiaries that CMS Energy purchased from Consumers for the $1.4 billion debenture.

On March 12, 1990, Consumers also moved to terminate all further surcharge rate relief granted in 1985. The PSC promptly granted Consumers' motion on March 13, but provided that elimination of the surcharge did not resolve all issues relating to the surcharge.

On March 27, the PSC responded to numerous pleadings by ordering a consolidated comprehensive case review of Consumers' compliance with the 1985 orders during 1988, 1989, and 1990. Meanwhile, the Attorney General had obtained a temporary restraining order in the Ingham Circuit Court on March 14, 1990, preventing any transfer of the proceeds. On March 29, the Ingham Circuit Court ordered the PSC to conduct an expedited review of issues pertaining to the proceeds. The

PSC did this by "carving out" the proceeds issues from the comprehensive proceeding commenced by its March 27 order. This carved-out proceeding (U-9611 and U-7830 Step 3A) resulted in the PSC's May 23, 1990, opinion and order which is the subject of this appeal.

In its May 23 opinion, the PSC found that the cash, debt, and equity interest received from the sale of the Midland plant assets constituted proceeds under condition 11. The PSC disregarded the corporate restructuring that resulted in the proceeds being received by unregulated subsidiaries of CMS Energy and ruled that the proceeds belonged to Consumers. The PSC left for the future the issue of what could be done with the proceeds under condition 11, but ruled that exchanging the proceeds for the $1.4 billion debenture was not proper, after finding that the debenture was not satisfactory consideration and carried too much financial risk.

Appellants challenge the PSC's authority to control the proceeds that are now in the hands of nonregulated corporate entities. Appellants argue that the PSC's May 23 order constituted a "newly-stated, novel *misinterpretation* of Condition 11." (Emphasis by appellants.)

II

This is an appeal from the PSC's May 23, 1990, order, not from the PSC's orders of March 29, 1985, or July 24, 1985, which granted the surcharge rate relief and established condition 11. Appellants admit this and, indeed, this Court is without jurisdiction to review PSC orders from 1985 at this late date. MCL 462.26(1); MSA 22.45(1); *Attorney General v Public Service Comm,* 172 Mich App 778; 432 NW2d 437 (1988). Consequently, our review

must accept the fact of condition 11. We do not consider the extent of the PSC's authority to impose conditions in conjunction with determining rates or the authority or propriety of establishing condition 11 in particular.

It is appellants' burden to show by clear and satisfactory evidence that the PSC's order is unlawful or unreasonable. MCL 462.26(8); MSA 22.45(8). Const 1963, art 6, § 28 also applies, and provides that a final agency order must be authorized by law and supported by competent, material, and substantial evidence on the whole record. This Court gives due deference to the PSC's administrative expertise and will not substitute its judgment for that of the PSC. *Yankoviak v Public Service Comm,* 349 Mich 641, 648; 85 NW2d 75 (1975); *Building Owners & Managers Ass'n of Metropolitan Detroit v Public Service Comm,* 131 Mich App 504, 517; 346 NW2d 581 (1984), aff'd 424 Mich 494; 383 NW2d 72 (1986).

The PSC is a creature of the Legislature, and all of its authority must be found in statutory enactments. *Union Carbide Corp v Public Service Comm,* 431 Mich 135, 146; 428 NW2d 322 (1988); *Huron Portland Cement Co v Public Service Comm,* 351 Mich 255, 262; 88 NW2d 492 (1958). The PSC has authority to fix and regulate reasonable rates. However, the PSC is not the owner of a regulated utility's property, and the PSC is not clothed with the general power of management incident to ownership. *Union Carbide, supra* at 148-149.

III

Condition 11 involves management-type decisions. It directly involves decisions about the use of significant business resources. The PSC recognized

this in 1985, because it required Consumers to acquiesce in the letter and spirit of all of the conditions. Even in its May 23, 1990, order, the PSC recognized that it had no control over how Consumers disposed of the Midland assets. The PSC only asserted control over the proceeds from that disposition.

Not surprisingly, appellants argue that the PSC cannot direct the use of the proceeds, because that would involve management-type decisions. But, under the circumstances of this case, we conclude that any right to argue that the PSC is without authority to control the use of the proceeds has been waived. All involved in 1985 realized that an extraordinary situation existed. Consumers never appealed the orders establishing condition 11. Consumers agreed to the letter and spirit of condition 11 in 1985, and reaffirmed its agreement in 1986, 1987, 1988, and 1989. Consumers collected hundreds of millions of dollars in rates that were granted subject to condition 11. The PSC determined rates for five years in reliance in part on its 1985 orders and the related conditions. Our Legislature and Supreme Court have recognized the need for validity and finality in rate-making proceedings. MCL 462.25; MSA 22.44; *Building Owners & Managers Ass'n of Metropolitan Detroit v Public Service Comm,* 424 Mich 494, 507; 383 NW2d 72 (1986). We emphasize that we hold only that appellants may not now be heard to argue that condition 11 improperly infringes on their general management powers. That is what was agreed to in 1985.

This holding does not expand the PSC's subject-matter jurisdiction by consent or waiver, something which cannot be done. *In re Estate of Fraser,* 288 Mich 392; 285 NW 1 (1939), and *James v Dep't of Mental Health,* 145 Mich App 229, 232-233; 377

NW2d 824 (1985). Subject matter jurisdiction is a broad concept referring to the right to exercise power over and to try cases of a particular class and character; it is not tied to the particular case before a decisional body. See *State Hwy Comm'r v Gulf Oil Corp,* 377 Mich 309, 312; 140 NW2d 500 (1966); *Joy v Two-Bit Corp,* 287 Mich 244, 253; 283 NW 45 (1938); *Huntington Woods v Ajax Paving Industries, Inc,* 177 Mich App 351, 357; 441 NW2d 99 (1989); *Adams v Adams,* 100 Mich App 1, 16; 298 NW2d 871 (1980). Here, the psc had subject-matter jurisdiction over Consumers' rate request in 1985, and the psc had jurisdiction over enforcement of its own orders.

IV

We do not find that the psc's May 23, 1990, opinion reflects a redefinition of condition 11 or a departure from the psc's past interpretation of condition 11. Between 1985 and 1990, "proceeds" of much smaller value had been in the form of cash and had been accounted for by a reduction in the surcharge rate. But our review of numerous, related psc opinions indicates that the psc never restricted "proceeds" to cash or cash equivalents and never restricted the use of proceeds to a reduction in the surcharge rate. As early as the October 22, 1986, opinion in the first compliance case, U-8431, the psc indicated its disagreement with a restrictive interpretation of "proceeds." Similarly, the psc disputed Consumers' interpretation of proceeds in the application of condition 11 in an August 23, 1988, opinion in U-8630 and U-8713.

The psc's decisions have been consistent with the broad construction of "proceeds" implicit in the wording of condition 11. The use of the word

"proceeds" in itself indicates that more than cash and cash equivalents was contemplated in 1985. In its May 23 order, the PSC found that the cash, debt, and equity interest received by the subsidiaries of CMS Energy for the Midland assets were proceeds under condition 11. This finding was not a new interpretation of condition 11.

Condition 11 does not dictate what the "proper use" of proceeds must be. In the past, the PSC reduced the surcharge rate for amounts recovered as proceeds. But that does not mean that the PSC must always do so. Condition 11 provides for a hearing to determine the proper use of proceeds. Thus, condition 11 itself indicates that the use of proceeds will depend on the circumstances existing when particular proceeds are available.

The PSC has not determined the proper use of the proceeds. At this juncture we merely find that the PSC has not newly interpreted or misinterpreted condition 11.

V

Previously, proceeds have been directly controlled by Consumers. The proceeds involved here are in the possession of CMS Energy and unregulated subsidiaries of CMS Energy. But again we do not find that the PSC changed its interpretation of condition 11. Condition 11 was broadly written and covered proceeds "directly or indirectly" received. Moreover, when condition 11 was established, Consumers existed in a completely different corporate structure.

The PSC in effect found that the proceeds involved here were "indirectly" received by Consumers. Appellants have not shown such a conclusion to be incorrect, MCL 462.26(8); MSA 22.45(8), or to be without substantial evidentiary support, even

though the proceeds were directly received by CMS Energy and its nonregulated subsidiaries.

Although the existence of corporate entities is given high regard, the formalities of separate corporate existence may be disregarded where they are designed for an improper use such as to avoid legal obligations. *Yankoviak v Public Service Comm,* 349 Mich 641, 648-649; 85 NW2d 75 (1957); *People ex rel Attorney General v Michigan Bell Telephone Co,* 246 Mich 198, 204; 224 NW 438 (1929); *Michigan Bell Communications, Inc v Michigan Public Service Comm,* 155 Mich App 40, 46-47; 399 NW2d 49 (1986). Actual fraud need not be shown. *People ex rel Attorney General, supra* at 204.

Here, the PSC appropriately disregarded the separate corporate entities. The relationship between Consumers and CMS Energy was extremely close. They shared directors and a chairman. Although Consumers was a subsidiary of CMS Energy, it constituted the bulk of CMS Energy's business. The transfer of the subsidiaries controlling the Midland assets from Consumers to CMS Energy was designed to avoid regulation of the proceeds to be generated by those assets. This is clear from the record. Under these circumstances, it was appropriate to pierce the corporate veil of the nonregulated corporate entities. However, this does not mean those corporations may be disregarded for other purposes.

In a related argument, appellants contend that the Midland assets were transferred in 1987 from Consumers to its subsidiaries and that the March 12, 1990, transactions were merely the sale of stock. If this were so and if all separate corporations were honored, Consumers would have violated condition 11 when it failed to submit the question of the use of the proceeds from the sale of

the stock of its subsidiaries to a hearing before the PSC pursuant to condition 11 before transferring that stock out of its control.

Once the separate corporate entities are disregarded for purposes of "returning" the proceeds, several of appellants' arguments fail. It does not matter that Consumers itself never received the proceeds or that the proceeds were received by nonregulated entities. Moreover, the nonregulated corporations involved were well aware of condition 11. For purposes of enforcing condition 11, the nonregulated corporations and Consumers may "be regarded in legal contemplation as one unit." *People ex rel Attorney General, supra* at 204.

## VI

The PSC may enforce condition 11 even though the surcharge rates were eliminated on March 12, 1990 (after Consumers' request to do so). Although the surcharge was granted "subject to" the twelve conditions, the PSC's 1985 orders did not contemplate that all conditions would automatically terminate with the expiration of the surcharge.

Termination of at least some of the conditions was obviously not dependent upon the termination of the surcharge. For example, condition 6 provides for an offset of any recovery in Step 3B, and the Step 3B proceeding is still pending. While perhaps not as obvious, condition 11 need not terminate coincidentally with the surcharge. Under a contrary construction Consumers could easily avoid condition 11 by simply deferring the sale of any assets or the settlement of any litigation until after the surcharge was terminated.

## VII

The PSC rejected appellants' argument that the

particular proceeds involved in this case were beyond the reach of condition 11 because they were proceeds from assets which had previously been removed from the psc's jurisdiction with the psc's approval. This argument is based on the fact that when Consumers obtained the psc's permission to use the Midland assets in the cogeneration venture, it was understood that the assets would never be the basis of any future rate request and that the assets would not be considered in Consumers' pending rate request in Step 3B.

The psc properly rejected appellants' argument. The psc granted relief from condition 5 in 1986, not from condition 11. The psc did not indicate that condition 11 would no longer apply to the "nonjurisdictional" assets transferred to the cogeneration venture. While those assets would never be directly paid for by ratepayers, the obligations and liabilities incurred when those assets were acquired remained on Consumers' books and were a factor in the rates customers paid. They are also a factor in the financial viability of Consumers, which it was the purpose of the 1985 package of rate relief and conditions to protect.

### VIII

The remaining issues can be summarily resolved.

The psc's May 23, 1990, order does not unconstitutionally impair contract rights. US Const, art I, § 10; Const 1963, art 1, § 10. The psc did interfere with the contract between CMS Energy and Consumers for the sale of CMS Midland and MEC Development stock to CMS Energy, but the interference was permissible. The psc's purpose was to protect the integrity of condition 11, which was established to protect a significant public interest.

A heavily regulated business was involved. Condition 11 predated any of the contracts with which the PSC might have interfered, and the contracts were entered into with knowledge of condition 11. Under these circumstances the PSC's action was not prohibited by the Contract Clause. *Energy Reserves Group, Ins v Kansas Power & Light Co,* 459 US 400, 411; 103 S Ct 697; 74 L Ed 2d 569 (1983). The Contract Clause can accommodate the inherent power of the state to safeguard vital public interests. *Id.*

The May 23 order is not preempted by the federal law (see Public Utility Regulatory Policies Act of 1978, 16 USC 824a-3) dealing with cogeneration facilities. The PSC's order does not involve the cogeneration plant. The order does not affect the use of the transferred assets by the cogeneration venture.

The PSC did not unconstitutionally confiscate appellants' property. CMS Energy and its unregulated subsidiaries have no legitimate claim to the proceeds in the first place. As discussed above, for purposes of the return of the proceeds, appellants are considered a single entity.

Finally, the PSC did not violate the requirement that its decision be based on competent, material, and substantial evidence, Const 1963, art 6, § 28; MCL 24.306(1)(d); MSA 3.560(206)(1)(d), or the prohibition against arbitrary and capricious decisions, MCL 24.306(1)(e); MSA 3.560(206)(1)(e). There was no meaningful factual determination that was not supported by sufficient evidence. The issue before the PSC was primarily one of interpreting its own order. Its interpretation was not unreasonable.

IX

Appellants have not shown that the May 23,

1990, order was unlawful, unreasonable, or unsupported by competent, material, and substantial evidence.

Affirmed.