652 N.W.2d 1 (2002)
252 Mich. App. 254
MICHIGAN ELECTRIC AND GAS ASSOCIATION, the Detroit Edison Company, Consumers Energy Company, and Michigan Consolidated Gas Company, Appellants,
v.
MICHIGAN PUBLIC SERVICE COMMISSION, Michigan Alliance for Fair Competition, National Energy Marketers Association, Michigan Cable Telecommunications Association, Michigan Electric Cooperative Association, Edison Sault Electric Company, and Energy Michigan, Inc., Appellees.
Docket No. 227713.
Court of Appeals of Michigan.
Submitted June 12, 2002, at Lansing.
Decided July 19, 2002, at 9:00 a.m.
Released for Publication October 6, 2002.
Loomis, Ewert, Parsley, Davis & Gotting, P.C. (by Harvey J. Messing, Sherri A. Wellman, and Lisa A. Hanson), Lansing, for Michigan Electric and Gas Association, The Detroit Edison Company, Consumers Energy Company, and Michigan Consolidated Gas Company.
Jennifer M. Granholm, Attorney General, Thomas L. Casey, Solicitor General, and David A. Voges and Henry J. Boynton, Assistant Attorneys General, for Michigan Public Service Commission.
Fraser Trebilcock Davis & Foster, P.C. (by David E.S. Marvin and Michael S. Ashton), Lansing, for Michigan Cable Telecommunications Association.
Before: OWENS, P.J., and SAWYER and COOPER, JJ.
*2 SAWYER, J.
Appellants, Michigan Electric and Gas Association, The Detroit Edison Company, Consumers Energy Company, and Michigan Consolidated Gas Company, appeal as of right from the May 3, 2000, opinion and order of the Michigan Public Service Commission (PSC) that issued revised "guidelines" (or conditions) regarding transactions between a regulated public utility and its nonregulated holding company, subsidiaries, and affiliates. Appellees PSC and Michigan Cable Telecommunications Association have filed appeal briefs in support of the PSC's order. Because we conclude that the procedure utilized by the PSC was invalid under the Administrative Procedures Act (APA), M.C.L. § 24.201 et seq., we vacate the PSC's order as unlawful.

I. Facts and Procedural History
In 1987, the PSC initiated sua sponte an investigation of Consumers Power Company's decision to restructure its corporation into a large holding company, CMS Energy Corporation (CMS), and a variety of subsidiaries, affiliates, and joint ventures, including Consumers Power Company and Midland Cogeneration Venture Limited Partnership (MCV). MCV was a limited partnership created to construct and operate a gas-fired electric cogeneration facility at the site of Consumers' abandoned Midland nuclear power plant. CMS Midland, Inc., a wholly owned subsidiary of CMS, was a general partner in MCV and held a forty-nine percent voting interest in the partnership. CMS or its subsidiaries held various debt securities and contractual obligations of MCV, and Consumers was a major purchaser of power from MCV, as well as a supplier of natural gas to the cogeneration facility. The commission was concerned that its ability to regulate Consumers was hindered by its lack of access to the accounts and records of the utility's affiliates and subsidiaries and that the billing practices of these affiliates and subsidiaries could involve "cross-subsidization of nonutility investments through utility rates." Midland Cogeneration Venture Ltd. Partnership v. Public Service Comm., 199 Mich.App. 286, 289-291, 501 N.W.2d 573 (1993). In light of these concerns, the staff recommended the imposition of certain reporting, bookkeeping, and information-access "conditions" covering Consumers' holding company, subsidiaries, affiliates, and joint ventures.
The PSC adopted seven conditions that required Consumers to ensure PSC access to the books and records of CMS and each of the utility's affiliates, subsidiaries, and joint ventures, furnish the PSC with certain financial statements of the holding company and nonutility subsidiaries, and file various annual statements and reports regarding the utility's interaffiliate transfers and transactions. See id. at 291-293, 501 N.W.2d 573 for the full text of the original conditions. In subsequent orders in the late 1980s and early 1990s, the PSC also applied these conditions to SEMCO Energy Gas Company and Michigan Consolidated Gas Company (Mich. Con), in addition to Consumers and its holding company, affiliates, and subsidiaries.
Although not a party to the proceeding initiated by the PSC in 1987, MCV filed a claim of appeal from the decision, challenging the commission's authority to impose conditions on MCV. This Court upheld the commission's authority to impose reporting and information-access requirements on Consumers, as well as the utility's parent corporation and nonregulated affiliates and subsidiaries "where such information is reasonably necessary for the proper performance of the PSC's duties." Midland Cogeneration, supra at 297, 501 N.W.2d 573. However, this Court found no statutory authority for the commission's imposition *3 of specific accounting and bookkeeping methods directly on MCV. Id. at 300-304, 501 N.W.2d 573.
Several years later, on March 8, 1999, the PSC sua sponte issued an order and notice of hearing of a contested case proceeding to consider changes to these guidelines. The PSC described the objectives of the proceeding as follows:
Several years have passed since the Commission imposed these guidelines on [Consumers, SEMCO, and Mich. Con]. During that time, significant changes have occurred in Michigan's electric and gas industries, including the advent of retail competition. The Commission therefore finds that it should initiate a contested case proceeding to (1) review these requirements, (2) determine which of the guidelines may no longer be appropriate or what new conditions may be required in today's industry, and (3) decide whether to expand or reduce the list of entities to which these requirements should apply.
Accordingly, interested parties are invited to review the previously-adopted guidelines ... and, if they so desire, participate in this case to help determine whether any or all of the existing requirements should be deleted, whether new requirements should be added, and whether the guidelines should be imposed on a larger or smaller group of entities.
A hearing referee granted leave to intervene to various interested parties, including appellants, appellees, and the PSC staff. Following a hearing, the hearing referee issued a proposal for decision, recommending reaffirmance of the guidelines, subject only to minor revisions proposed by the PSC staff.
On May 3, 2000, after various parties filed exceptions to the proposal for decision and replies to the exceptions, the PSC issued its opinion and order in this proceeding. The PSC adopted the following revised guidelines:

GUIDELINES FOR TRANSACTIONS BETWEEN AFFILIATES
These guidelines apply to all public utilities that provide electric or natural gas service subject to the statutory authority of the Michigan Public Service Commission.
1. The utility shall ensure that the Commission has access to books and records of the holding company and each of its affiliates and their joint ventures. Any objections to providing access as requested under this guideline must be raised before the Commission, and the burden of showing that the request is unreasonable or unrelated to the proceeding is on the party seeking to deny or withhold access.
2. Each utility, holding company, and each of its subsidiaries and the joint ventures of the holding company and/or its subsidiaries shall employ accounting and other procedures and controls related to cost allocations and transfer pricing to ensure and facilitate full review by the Commission and to protect against cross-subsidization of nonutility activities by the utility's customers.
3. The holding company and each of its subsidiaries and the joint ventures of the holding company and/or its subsidiaries shall keep their books in a manner consistent with general accounting principles and, where applicable, consistent with the Uniform System of Accounts.
4. The utility shall furnish the Commission with:
a. Consolidated 10K reports and shareholders' reports of the consolidated utility and/or its parent holding company on an annual basis;

*4 b. Annual reports concerning the utility's intercompany transactions. The report shall provide a specific explanation of the nature of each transaction and a specific description of the basis for the cost allocations and transfer pricing established in each transaction;
c. Annual balance sheets and income statements of the non-regulated subsidiaries of the utility and/or the nonconsolidated subsidiaries of the holding company;
d. Reports of internal audits conducted regarding transactions between the utility and its non-utility affiliates, which shall be submitted with the annual report for the year 2000 and with subsequent annual reports due at the end of each third year following 2000. The audit report shall address transactions occurring since the last audit report and shall determine whether appropriate cost allocation procedures and transfer pricing methodologies were followed and whether the utility and its affiliates are maintaining records that are adequate to facilitate an effective audit of the transactions. The Commission Staff may require more frequent reports or conduct additional audits when appropriate;
e. Copies of federal income tax returns, whether on a consolidated or nonconsolidated basis, need not be submitted to the Commission, but they shall be available to the Commission for inspection and review at the utility's Michigan business office.
5. The utility shall avoid a diversion of management talent that would adversely affect the utility. An annual report identifying employees transferred from the utility to non-utility subsidiaries is required. The report shall provide the name of each employee, the employee's former function or department within the utility, and the function or department of the subsidiary to which the employee was transferred.
6. The utility shall notify the Commission in writing within thirty days prior to any transfer to non-utility affiliates of any utility assets or property exceeding a fair market value of $100,000. At the time that notice is provided, the utility shall make available to the Commission information that demonstrates how the transfer price was determined. Asset transfers from regulated to nonregulated shall be at the higher of cost or fair market value and nonregulated to regulated shall be at the lower of cost or fair market value. All services and supplies provided by non-regulated enterprises shall be at market price or 10% over fully allocated cost, whichever is less.
7. Market, technological, or similar data transferred, directly or indirectly, from the utility to a non-utility affiliate shall be transferred at the higher of cost or fair market value.
8. In its annual report, each utility shall provide information on any arrangement that allows an affiliate to obtain credit in a manner that permits a creditor, upon default, to have recourse to or in any way encumber the utility's assets.
9. A utility may file an application for a waiver from any provision of these guidelines. The application shall demonstrate the basis for the waiver. The Commission, in deciding the application, may consider the costs and benefits of compliance. For good cause shown, the Commission may grant the waiver if compliance is determined to be impractical or unreasonable under the circumstances.
10. For purposes of applying these guidelines, "affiliate" and "subsidiary" shall have the same meanings as the *5 definitions provided for "associated companies," and "subsidiary company," respectively, in the Uniform System of Accounts for gas and electric utilities, which are adopted by Commission rule. Other words defined in the Uniform System of Accounts that are used in the definitions of "associated companies" and "subsidiary company" (e.g., "control") shall also retain their defined meanings. (See R. 460.9001, R. 460.9021.)
In summarizing its rationale for adoption of the guidelines, the PSC explained:
The Commission intended that the guidelines would provide an effective mechanism for identification and disclosure of affiliate transactions that pose difficult regulatory issues. On balance, the record developed under the ALJ's [hearing referee's] direction was adequate for the Commission to resolve its concerns that the guidelines were becoming outdated in some respects. This order updates the guidelines in light of contemporary developments. It further extends the guidelines to embrace all of the public utilities that are subject to the Commission's jurisdictional oversight.

II. Law and Analysis
Appellants contend that the affiliate transaction guidelines adopted by the PSC are in effect rules because they are intended to operate prospectively and to bind all electric and natural gas utilities. Appellants contend that the guidelines are invalid because they were adopted by order in a contested case proceeding rather than by the rulemaking procedure under the APA. Appellants further contend that, regardless of the procedure chosen by the PSC to adopt them, guidelines 2, 3, 6, and 7 are invalid because the PSC exceeded its authority by infringing utility management discretion.
While appellants' arguments encompass both a general procedural challenge and a substantive challenge to certain of the guidelines, we find the procedural issue to be dispositive of this case. Simply put, the proceeding in this matter was not properly initiated by the PSC as a "contested case" as defined by the APA; therefore, the resulting order is unlawful.

A. Standard of Review
The standard of review for PSC orders is narrow and well established. MCL 462.25 ... provides that all rates, fares, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. Michigan Consolidated Gas Co. v. Public Service Comm., 389 Mich. 624, 209 N.W.2d 210 (1973); Attorney General v. Public Service Comm., 206 Mich.App. 290, 294, 520 N.W.2d 636 (1994). An appellant must show by "clear and satisfactory evidence" that the order of the PSC complained of is "unlawful or unreasonable." MCL 462.26(8); ... Michigan Consolidated Gas Co, supra at 639, 209 N.W.2d 210; CMS Energy Corp. v. Attorney General, 190 Mich.App. 220, 228, 475 N.W.2d 451 (1991); Attorney General, supra at 294, 520 N.W.2d 636. [Ford Motor Co. v. Public Service Comm., 221 Mich.App. 370, 373, 562 N.W.2d 224 (1997).]
In addition, this Court has held that the question whether an agency policy is invalid because it was not promulgated as a rule under the APA is reviewed de novo as a question of law. Faircloth v. Family Independence Agency, 232 Mich.App. 391, 401, 591 N.W.2d 314 (1998).

B. Contested Case Proceeding Under the APA
The PSC, as a creature of statute, derives its authority from the underlying statutes and possesses no common-law *6 powers. Union Carbide Corp. v. Public Service Comm., 431 Mich. 135, 146-162, 428 N.W.2d 322 (1988). The statutes governing the PSC include the Public Service Commission act, M.C.L. § 460.1 et seq., the Public Utilities Commission act, M.C.L. § 460.54 et seq., the transmission of electricity act, M.C.L. § 460.551 et seq., and the natural gas act, 1929 PA 9; MCL 483.101 et seq. In particular, we note that the PSC must promulgate rules "for the conduct of its business and the proper discharge of its functions" to the extent it intends to make its policies binding on "all persons dealing with the commission or interested in any matter or proceedings pending before it...." M.C.L. § 460.55; see also Union Carbide Corp, supra at 152, 428 N.W.2d 322. Rule promulgation must be conducted pursuant to the APA. See, e.g., M.C.L. § 460.557(6).
The APA defines a "rule" as follows, in pertinent part:
"Rule" means an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency, or that prescribes the organization, procedure, or practice of the agency, including the amendment, suspension, or rescission of the law enforced or administered by the agency. [MCL 24.207.]
The APA incorporates several specific exemptions from the definition of "rule," including "[a] determination, decision, or order in a contested case." MCL 24.207(f). A "contested case" is defined as "a proceeding, including rate-making, price-fixing, and licensing, in which a determination of the legal rights, duties, or privileges of a named party is required by law to be made by an agency after an opportunity for an evidentiary hearing." MCL 24.203(3). In its order initiating this proceeding, the PSC invoked its general ratemaking authority as the basis for its implementation of the subject affiliate transaction "guidelines"[1] by order in a contested case.[2] We find both substantive and procedural flaws with regard to this action by the PSC.
First, as a substantive matter, we find that the proceeding initiated by the PSC only tangentially involved ratemaking. In Consumers Power Co. v. Public Service Comm., 460 Mich. 148, 596 N.W.2d 126 (1999), the Michigan Supreme Court considered an appeal by electric utilities and others from a PSC order that authorized an experimental "retail wheeling program," which allowed electricity to be transmitted from third-party providers to customers through the local utility's system. The Court rejected the PSC's claim that the retail wheeling program fell within *7 its ratemaking authority, id. at 157-159, 596 N.W.2d 126:
The PSC initially characterizes its retail wheeling program as ratemaking, thus falling within its authority under § 7 of the electric transmission act, M.C.L. § 460.557..., and § 22 of the railroad commission act, M.C.L. § 462.22.... See also M.C.L. § 460.6a.... The challenged portion of the order does not, however, involve ratemaking. Although retail wheeling has a ratemaking component, i.e., the establishment of the rate a third-party provider must pay to transmit power through a local utility's system, appellants do not challenge that aspect of the experimental program. Instead, appellants contend that the PSC cannot order local utilities to transmit electricity from a third-party provider's system through its own system to an end-user. This aspect of retail wheeling is simply not ratemaking.
As in the case above, we find that the PSC's adoption of affiliate transaction guidelines may have incorporated a "ratemaking component"e.g., to ensure a reasonable and just rate for utility customers through implementation of certain bookkeeping and accounting mandatesbut the proceeding was clearly neither a rate case, M.C.L. § 460.1 et seq., nor an investigation of rates upon complaint, M.C.L. § 460.58. Indeed, the PSC initiated this proceeding unilaterally for the sole purpose of reviewing and revising its existing policies regarding affiliate transactions, not to set or review rates. Thus, the PSC's underlying justification for invoking a contested case fails as a matter of law.
Second, as a procedural matter, the proceeding initiated by the PSC was wholly incompatible with the definition of "contested case" under the APA. The PSC's order initiating this contested case did not list any named parties, as required by M.C.L. § 24.203(3), but instead directed "[a]ny person wishing to intervene and become a party to the case" to file a timely intervention petition. Numerous individual utilities and associations intervened in the proceeding. However, while each of these intervening entities certainly became a "party," as defined by the APA, M.C.L. § 24.205(5), formally M.C.L. § 24.205(4) before enactment of 1999 PA 262, effective April 1, 2000, and the PSC's own rules of practice and procedure, 1999 AC, R. 460.17101(f), they did not become "named" parties as required to invoke a contested case in the first instance. MCL 24.203(3). Thus, because "the legal rights, duties, or privileges of a named party" were not determined, the proceeding was not a contested case.
Third, contrary to the definitional limitations of a contested case, the proceeding here was initiated by the PSC against unnamed entities with the express intent to review and revise existing regulatory standards that would have general and prospective application to all electric and natural gas utilities subject to the PSC's jurisdiction, as well as the nonregulated affiliates and subsidiaries of those utilities. The typical contested case proceeding involves an individual named party and a disputed set of factse.g., a license denial, a denial of benefits, or a statutory violationfrom which results an agency order that adjudicates the specific factual dispute and operates retroactively to bind the agency and the named party. Such orders operate prospectively only to the extent that they constitute binding precedent with respect to an agency's interpretation of a statute. See LeDuc, Michigan Administrative Law, § 1:06, p. 12 (an order resulting from a contested case proceeding has binding effect on the parties to the case, yet also serves as precedent in cases with identical or closely related facts).
*8 Invoking the public interest and the need for policy that is responsive to a changing industry, the PSC eschewed the procedural mandates of the APA in favor of its own course of action. By choosing to implement "guidelines" by order in a contested case against unnamed parties, yet with the force and effect of law, the PSC culled elements of rulemaking, adjudication, and general policy formulation, with little regard for the dictates of the APA. While we do not doubt the PSC's legitimate concerns of lack of access to the accounts and records of a utility's nonregulated affiliates and subsidiaries, and the potential for "cross-subsidization of nonutility investments through utility rates," see Midland Cogeneration Venture, supra at 291, 501 N.W.2d 573, the process utilized by the PSC constituted a rather heavy-handed rebuke of established APA procedures, and, accordingly, we are compelled to invalidate that process.[3]
Vacated. We retain no further jurisdiction.
NOTES
[1] The Michigan APA defines a "guideline" as "an agency statement or declaration of policy which the agency intends to follow, which does not have the force or effect of law, and which binds the agency but does not bind any other person." MCL 24.203(6). An agency may not circumvent the APA requirements by adopting guidelines in lieu of rules. MCL 24.226. Here, although the PSC labeled its regulatory standards as "guidelines," they were not adopted as such in accordance with Chapter 2 of the Michigan APA, M.C.L. § 24.224 et seq., which mandates substantial compliance with specific notice and dissemination provisions. The label an agency assigns to a directive is not dispositive; instead, a court must examine the actual action undertaken by the directive to determine whether the policy implemented had the effect of a rule. American Federation of State, County & Municipal Employees v. Dep't of Mental Health, 452 Mich. 1, 9-10 & n. 8, 550 N.W.2d 190 (1996). Accordingly, the PSC's labeling of its regulatory standards as "guidelines" is a misnomer.
[2] In its order, the PSC declared: "The Commission's statutory authority to decide the ratemaking consequences of affiliate transactions is beyond serious dispute."
[3] Accordingly, because the process utilized by the PSC has led to an unlawful order, we leave unresolved the portentous issues whether the Legislature has specifically delegated authority to the PSC to impose regulatory standards on entities outside its jurisdiction and, if such statutory authority does exist, whether the standards must necessarily be promulgated as rules under the APA.