*In re* APPLICATION OF DETROIT EDISON COMPANY

Docket Nos. 259845, 264099, 264131, 264156, 264191. Submitted February 21, 2007, at Lansing. Decided July 3, 2007, at 9:10 a.m. Leave to appeal sought.

The Detroit Edison Company filed an application in the Public Service Commission to increase its electricity rates and reinstate its power supply cost recovery (PSCR) plan, as well as for approval of a regulatory asset recovery surcharge, implementation of a mitigation adjustment mechanism, approval of an earnings-sharing mechanism, termination of its securitization and transition charges for choice customers, and authorization to use excess securitization savings to recover its stranded costs. The PSC issued an interim order that required Edison to reinstate its PSCR clause, then granted in part and denied in part Edison's request for relief. The PSC also ruled that Edison had the authority to charge its customers to subsidize the costs of its renewable energy program. After granting in part Edison's petition for rehearing, the PSC reaffirmed the bulk of its holdings, and Edison, the Attorney General, the Michigan Environmental Council (MEC) and the Public Interest Research Group In Michigan (PIRGIM), and the Association of Businesses Advocating Tariff Equity (ABATE) separately appealed various aspects of the PSC's rulings. The Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

1. The PSC's order authorizing Edison to impose new surcharges on residential customers during a period in which the Legislature had capped rates at a reduced level was not unlawful or unreasonable because the surcharges were offset by decreases in other rates, which resulted in no overall rate increase.

2. The PSC's decision to allow Edison to recover transmission costs is within the PSC's broad ratemaking authority and consistent with the governing statutory language, previous PSC decisions, and applicable caselaw.

3. The PSC's order requiring Edison's customers to provide funding for the low-income and energy-efficiency fund (LIEEF) that will not be used in Edison's service territory is not unlawful because the statutory language that created the LIEEF referred to

it in the singular and did not limit the use of a utility's funds to that utility's own service territory.

4. The PSC lacked the statutory authority to empower Edison to impose an additional monthly charge on all its customers whose rates were not capped in order to subsidize the cost of Edison's voluntary renewable energy program.

5. The PSC's decision not to reduce Edison's short-term debt or increase its working capital so that Edison's base rate would equal its liabilities was not unlawful or unreasonable. The PSC was entitled to use a six-month rather than a 12-month average to calculate Edison's short-term debt, and was also entitled to rely on the evidence provided by its staff despite the existence of contradictory evidence.

6. Edison is entitled to recover its share of the control premium its parent company paid to acquire another energy company, despite the fact that the company was in financial distress, because the merger resulted in cost savings. Because allowing Edison to amortize its recovery of the control premium over a 40-year period is too speculative, Edison must substantiate its savings in its next rate case.

7. Edison did not show by clear and convincing evidence that the PSC's decision not to adjust the test year for an additional year of inflation when using data from the year 2002 that were adjusted for inflation for 2003 and 2004, when the PSC did not release its final order until November 2004, was unlawful or unreasonable; the PSC has the discretion to allow a test year not to coincide precisely with the year that rates are implemented.

8. The issues related to spent nuclear fuel raised by MEC and PIRGIM were already raised and decided by this Court in a previous case; therefore, these claims are barred under the doctrine of collateral estoppel.

9. The PSC acted within its broad ratemaking authority in adopting a transitional power supply rate tariff that applied only to customers with whom Edison had entered into special manufacturing contracts in light of the rate shock that those customers would experience if subjected to regular tariff rates and the possibility that they would leave Edison's service entirely as a result. Contrary to ABATE's assertion, the PSC's decision on this issue was based on sufficient evidence in the record.

10. The PSC correctly concluded that it should treat Edison's request for establishment of a PSCR base and factors as having been brought under MCL 460.6j(3) through (7), despite the fact

that Edison's application cited MCL 460.6j(18), because the PSC had determined that Edison's PSCR clause was automatically reinstated and Edison filed a separate PSCR plan case for 2005.

Affirmed in part and reversed in part.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Susan I. Leffler* and *Donald E. Erickson*, Assistant Attorneys General, for the Attorney General.

*Dykema Gossett PLLC* (by *Albert Ernst, Stewart A. Binke*, and *Christine Mason Soneral*) for the Public Service Commission.

*Bruce R. Maters, Jon P. Christinidis, Richard P. Middleton*, and *Michael J. Solo, Jr.*, and *Foster, Swift, Collins & Smith, P.C.* (by *William K. Fahey* and *Stephen J. Rhodes*), for the Detroit Edison Company.

*Clark Hill PLC* (by *Don L. Keskey*) for the Michigan Environmental Council and the Public Interest Research Group in Michigan.

*Clark Hill PLC* (by *Robert A. W. Strong* and *Thomas E. Maier*) for the Association of Businesses Advocating Tariff Equity.

Before: MARKEY, P.J., and SAAD and WILDER, JJ.

SAAD, J.

### I. INTRODUCTION

On June 20, 2003, the Detroit Edison Company (Edison) filed its application for an increase in its rate schedules that govern the distribution and supply of electric energy. The hearings before the Public Service

Commission (PSC) were extensive.[1] And, as the PSC noted, the proceedings before it were "among the most complex cases ever considered by the Commission."[2] Indeed, as the PSC opined in its November 23, 2004, opinion and order, this case "affects not only the operations of the utility, but also the finances of over two million of its residential and business customers in ways that no proceeding brought before this agency has ever done."[3]

Many of the issues decided by the PSC in this rate case have not been appealed by any party,[4] but those

---

[1] The PSC noted that the documents contained in the docket of this case encompass nearly 13,000 pages of testimony, exhibits, comments, and pleadings. See *In re Application of Detroit Edison Co,* opinion and order of the Public Service Commission, issued November 23, 2004 (Case No. U-13808) (November 23, 2004, order), p 4 n 4.

[2] *In re Application of Detroit Edison Co,* order of the Public Service Commission, issued November 4, 2003 (Case No. U-13808), p 8.

[3] November 23, 2004, order, *supra* at 1.

[4] As part of this rate case, the PSC: (1) concluded that use of the staff's proposed 2004 test year, which was based on the historical 2002 year adjusted for inflation and other measurable changes, was reasonable and appropriate because that year was based on known and measurable facts, whereas Edison's proposed 2004 test year, which was fully projected and based on proposed operating plans, budgets, and capital acquisitions, was based on assumptions as well as proposals that had not been approved by management; (2) accepted the staff's recommended base rate of $7,123,560,000 for Edison, finding that that rate was reasonable because it was based on the 2002 historical test year adjusted for various known factors; (3) accepted the staff's proposed capital structure of 54 percent debt and 46 percent equity; (4) rejected Edison's request that it be allowed to recover $61.6 million of the control premium paid to acquire MCN Energy; (5) found that Edison's operation and maintenance (O&M) expenses should be reduced by $45,359,000 and rejected Edison's assertion that because of the age of its generation fleet, its O&M expenses would outstrip inflation in the coming years; (6) rejected Edison's assertion that the 2002 historical figures, adjusted for inflation for 2003 and 2004, should be adjusted for an additional year of inflation; (7) rejected Edison's request to recover $9.4 million in costs incurred during 2000 and 2001 to divest transmission assets, an action taken as a step

issues appealed by Edison, the Attorney General, the Michigan Environmental Council and the Public Interest Research Group in Michigan (MEC/PIRGIM), and the Association of Businesses Advocating Tariff Equity (ABATE), were fully explored at a special three-hour hearing before this Court on February 21, 2007, wherein all parties presented their respective positions.

In Docket Nos. 259845, 264099, 264131, and 265156, the Attorney General of Michigan (AG), Edison, MEC/PIRGIM, and ABATE appeal the PSC's November 23, 2004, order regarding Edison's application for a rate increase. In Docket No. 264191, the AG appeals

toward complying with MCL 460.10w(1), and instead adopted the staff's position that the costs, which were incurred when Edison transferred transmission assets to an affiliate in preparation for sale of those assets to a third party, should be treated as an offset to the sale price in determining the premium realized from the sale; (8) adopted the staff's proposed transitional power supply rate (TPSR) tariff to be applied to contracts into which Edison entered with certain large manufacturing customers, but rejected the argument that all large manufacturing customers should be allowed to take service under the TPSR tariff; (9) affirmed that rate caps permitted netting rate reduction against rate increases to achieve rate adjustments, as long as the overall rate paid by customers did not increase; (10) emphasized that it had not rejected Edison's application to establish a PSCR factor under MCL 460.6j(18); (11) determined that all PSCR issues not addressed in the order could be raised in the 2004 PSCR reconciliation filing; (12) approved the inclusion of $39,858,000 in O&M costs to fund the low-income and energy efficiency fund (LIEEF), but rejected Edison's and the AG's assertion that the funds should be used only to serve low-income customers in its service territory; (13) found that the hearing referee correctly concluded that issues regarding spent nuclear fuel (SNF) should not be considered in the instant proceeding because related issues had been addressed in other proceedings; (14) found that the PSC had statutory authority under MCL 460.10b(1) and (6) to require Edison to establish a renewable energy program (REP) and concluded that Edison should do so; and (15) found that Edison should raise revenue to cover any shortfall in the amounts received under the REP by implementing a five-cent per meter, per billing cycle surcharge on all customers whose rates are no longer capped.

from the PSC's order of June 30, 2005, granting in part and denying in part Edison's petition for rehearing. These appeals have been consolidated for purposes of hearing and decision. We affirm in part and reverse in part.

## II. FACTS AND UNDERLYING PROCEEDINGS

The Michigan Legislature enacted 2000 PA 141, the Customer Choice and Electricity Reliability Act (Act 141), MCL 460.10 *et seq.*, as part of its decision to restructure and deregulate the electric utility industry in Michigan. *Attorney General v Pub Service Comm*, 249 Mich App 424, 426; 642 NW2d 691 (2002). Among other things, Act 141 reduced rates and imposed caps on the rates that an electric utility could charge its customers. MCL 460.10d provides in pertinent part:

(1) Except as otherwise provided under subsection (3) or unless otherwise reduced by the commission . . . the commission shall establish the residential rates for each electric utility with 1,000,000 or more retail customers in this state as of May 1, 2000[5] that will result in a 5% rate reduction from the rates that were authorized or in effect on May 1, 2000. Notwithstanding any other provision of law or commission order, rates for each electric utility with 1,000,000 or more retail customers established under this subsection become effective on June 5, 2000 and remain in effect until December 31, 2003 and all other electric retail rates of an electric utility with 1,000,000 or more retail customers authorized or in effect as of May 1, 2000 shall remain in effect until December 31, 2003.

(2) On and after December 31, 2003, rates for an electric utility with 1,000,000 or more retail customers in this state as of May 1, 2000 shall not be increased until the earlier of December 31, 2013 or until the commission determines, after notice and hearing, that the utility meets the market

---

[5] Edison is such a utility.

test under [MCL 460.10f] and has completed the transmission expansion provided for in the plan required under [MCL 460.10v]. The rates for commercial or manufacturing customers of an electric utility with 1,000,000 or more retail customers with annual peak demands of less than 15 kilowatts shall not be increased before January 1, 2005. There shall be no cost shifting from customers with capped rates to customers without capped rates as a result of this section. In no event shall residential rates be increased before January 1, 2006 above the rates established under subsection (1).

Edison's rates had not been comprehensively reviewed and set by the PSC since 1994, before Act 141 was enacted. Because of an expressed need to increase its rates and in anticipation of the expiration of the Act 141 caps, on June 20, 2003, Edison filed an application for a general rate case to increase its rates[6] and to implement a power supply cost recovery (PSCR)[7] plan and five-year forecast. MCL 460.6j(18) permits an electric utility to conduct a PSCR proceeding in the context of a general rate case. Edison sought an increase in its rates on both an interim and a permanent basis, approval of a regulatory asset recovery surcharge, reinstatement of its PSCR clause, a determination of its

---

[6] A "general rate case" is "a proceeding initiated by a utility in an application filed with the commission that alleges a revenue deficiency and requests an increase in the schedule of rates or charges based on the utility's total cost of providing service." MCL 460.6a(2)(b).

[7] A utility is entitled to recover the reasonable costs incurred in generating electricity. A "PSCR clause" is "a clause in the electric rates or rate schedule of a utility which permits the monthly adjustment of rates for power supply to allow the utility to recover the booked costs, including transportation costs, reclamation costs, and disposal and reprocessing costs, of fuel burned by the utility for electric generation and the booked costs of purchased and net interchanged power transactions by the utility incurred under reasonable and prudent policies and practices." MCL 460.6j(1)(a). The PSC "may incorporate a [PSCR] clause in the electric rates or rate schedule of a utility, but is not required to do so." MCL 460.6j(2).

stranded costs,[8] implementation of a mitigation adjustment mechanism, approval of an earnings-sharing mechanism, termination of its securitization and transition charges for choice customers, and authorization to use excess securitization savings to recover stranded costs.

The PSC entered interim orders on December 18, 2003, and February 20, 2004, that required Edison to reinstate its PSCR clause as of January 1, 2004,[9] and granted Edison interim relief in the amount of $248,430,000, respectively.

On November 23, 2004, the PSC granted in part and denied in part Edison's request for relief.[10] In an order entered on June 30, 2005, the PSC granted Edison's petition for rehearing in part and denied it in part.[11] The PSC reaffirmed its holdings regarding Edison's capital structure, rate base, and capitalization; denied Edison's request to include the control premium paid in the acquisition of MCN in Edison's rates; and reaffirmed its holdings regarding the adjustment for inflation of the base rate and the availability of the low-

---

[8] The PSC has defined "stranded costs" as costs incurred during an era of regulation that are above market prices and costs associated with the transition to competitive markets. Stranded costs include: "(1) regulatory assets, consisting of unrecovered costs of demand-side management programs and other similar costs, (2) capital costs of nuclear plants, (3) contract capacity costs arising from power purchase agreements, (4) employee retraining costs, and (5) costs related to the implementation of restructuring." *Consumers Energy Co v Pub Service Comm*, 268 Mich App 171, 181; 707 NW2d 633 (2005).

[9] In *Detroit Edison Co v Pub Service Comm*, unpublished opinion per curiam of the Court of Appeals, issued October 4, 2005 (Docket No. 252966), another panel of this Court affirmed the PSC's decision.

[10] The hearing referee conducted extensive hearings in April 2004. Those hearings generated 3,329 pages of transcript and 235 exhibits.

[11] Other parties also sought rehearing of the PSC's November 23, 2004, order.

income and energy efficiency fund (LIEEF) for customers throughout the state. More specifically, regarding Edison's assertion that the PSC rejected its PSCR proposal pursuant to MCL 460.6j(18), the PSC concluded that it should treat Edison's request for PSCR reinstatement and establishment of a PSCR base as having been raised under MCL 460.6j(3) through (7), which provide for the filing of annual PSCR plan and reconciliation cases.

### III. STANDARD OF REVIEW

The standard of review for PSC orders is narrow and well-defined. Pursuant to MCL 462.25, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. *Michigan Consolidated Gas Co v Pub Service Comm*, 389 Mich 624, 635-636; 209 NW2d 210 (1973). A party aggrieved by an order of the PSC has the burden of proving by clear and satisfactory evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a mandatory statute or abused its discretion in the exercise of its judgment. *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999). And, of course, an order is unreasonable if it is not supported by the evidence. *Associated Truck Lines, Inc v Pub Service Comm*, 377 Mich 259, 279; 140 NW2d 515 (1966). In sum, a final order of the PSC must be authorized by law and supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *Attorney General v Pub Service Comm*, 165 Mich App 230, 235; 418 NW2d 660 (1987).

Consistently with the law regarding appellate review of an administrative agency's decisions, we give due

deference to the PSC's administrative expertise and will not substitute our judgment for that of the PSC. *Attorney General v Pub Service Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999). Importantly, we "give great weight to any reasonable construction of a regulatory scheme that the PSC is empowered to administer," *Champion's Auto Ferry, Inc v Pub Service Comm*, 231 Mich App 699, 708; 588 NW2d 153 (1998), but we may not abandon our responsibility to interpret statutory language and legislative intent. *Miller Bros v Pub Service Comm*, 180 Mich App 227, 232; 446 NW2d 640 (1989). Whether the PSC exceeded the scope of its authority is a question of law that we review de novo. *In re Complaint of Pelland Against Ameritech Michigan*, 254 Mich App 675, 682; 658 NW2d 849 (2003).

### IV. ANALYSIS

#### A. AG'S APPEAL IN DOCKET NO. 259845

##### 1. IMPACT OF SURCHARGES

The PSC possesses only that authority granted to it by the Legislature. *Attorney General v Pub Service Comm*, 231 Mich App 76, 78; 585 NW2d 310 (1998). The statutes that confer power on the PSC must be strictly construed. Authority must be granted by clear and unmistakable language. Words and phrases in the PSC's enabling statutes must be read narrowly and in the context of the statutory scheme. See *Consumers Power Co v Public Service Comm*, 460 Mich 148, 155-159; 596 NW2d 126 (1999).

As part of its effort to deregulate the electric power industry, the Legislature provided relief to residential customers by reducing rates by 5 percent, freezing rates at that level until December 31, 2003, and capping rates at the reduced level until January 1, 2006. MCL

460.10d(1) and (2). In its November 23, 2004, order, the PSC authorized Edison to impose new surcharges on those customers during those periods, ruling that such surcharges were lawful because they were offset by reductions in other rates.

The AG argues that the PSC's order is unlawful and unreasonable because it violates the statutory prohibition against rate increases. Clearly, the imposition of a surcharge changes the rate charged to a customer. We note that MCL 460.10d(2) uses the plural term "rates." Yet, "every word importing the plural number may be applied and limited to the singular number." MCL 8.3b. The AG contends that because MCL 460.10d(2) does not use the term "total rate" or "total rates," the statute does not authorize the PSC to approve increases in some rates, even if those increases are offset by decreases in other rates. We reject this argument.

A general rate case, and this is a general rate case, seeks an increase in rates or charges based on the "total cost of providing service." MCL 460.6a(2)(b). The PSC has broad authority to set just and reasonable rates and may, in the exercise of its discretion, determine what factors are relevant in a particular case. *Attorney General, supra*, 231 Mich App at 79; *Attorney General v Pub Service Comm No 1*, 133 Mich App 719, 725-726; 349 NW2d 539 (1984). The PSC is not bound by any particular ratemaking methodology, and can make pragmatic adjustments to respond to any particular circumstances in any given case. *Attorney General v Pub Service Comm*, 189 Mich App 138, 148; 472 NW2d 53 (1991).

The AG contends that the term "rates" in MCL 460.10d(2) means each individual component of a rate charged by a utility, and that each component is capped under the statute. To accept this untenable assertion

would mean that the PSC could not change a utility's rate under any circumstances during the period in which the rate was capped. Were we to accept the AG's position, such a ruling would undermine the PSC's broad ratemaking authority and contradict the plain language of MCL 460.10d(8), which provides: "Except as provided under subsection (3), until the end of the period in subsection (2), the commission shall not authorize any fees or charges that will cause the residential rate reduction required under subsection (1) to be less than 5%." The import of the language of MCL 460.10d(8) is that the PSC may authorize raises in individual components of a rate as long as the raises do not increase an overall rate above the (reduced) rate mandated by the Legislature as set forth in MCL 460.10d(1) and the capped rate mandated by MCL 460.10d(2). This construction avoids conflict among the statutes, and therefore should and does control. *House Speaker v State Admin Bd*, 441 Mich 547, 568-569; 495 NW2d 539 (1993).

The PSC's decision to increase some rates while reducing others to avoid an overall increase is clearly within the PSC's broad ratemaking authority and discretion, and is a reasonable interpretation of the statutory scheme that it is empowered to administer. *Champion's Auto Ferry, supra.*[12]

### 2. TRANSMISSION EXPENSES

Our review of this issue begins with the pertinent statutory provision. MCL 460.6j provides in relevant part:

---

[12] The filed-rate doctrine holds that a public utility can claim no right to a rate other than the filed rate either fixed or accepted by the PSC. *Detroit Edison Co v Pub Service Comm*, 416 Mich 510, 516; 331 NW2d 159 (1982). Contrary to the AG's assertion, the PSC's November 23, 2004, order does not violate the filed-rate doctrine. All charges imposed by Edison are reflected in filed tariffs.

(1) As used in this act:

(a) "Power supply cost recovery clause" means a clause in the electric rates or rate schedule of a utility which permits the monthly adjustment of rates for power supply to allow the utility to recover the booked costs, including transportation costs, reclamation costs, and disposal and reprocessing costs, of fuel burned by the utility for electric generation and the booked costs of purchased and net interchanged power transactions by the utility incurred under reasonable and prudent policies and practices.

(b) "Power supply cost recovery factor" means that element of the rates to be charged for electric service to reflect power supply costs incurred by an electric utility and made pursuant to a power supply cost recovery clause incorporated in the rates or rate schedule of an electric utility.

The AG contends that the PSC's November 23, 2004, order is unlawful and unreasonable because it allows Edison to include transmission expenses in its PSCR clause. Transmission expenses are properly accounted for in a specific account established under the PSC's Uniform System of Accounts for Major and Nonmajor Electric Utilities. Mich Admin Code, R 460.9001. The AG asserts that the PSC had no authority to allow Edison to recover costs through a PSCR clause if that recovery is not authorized by statute. *Attorney General, supra,* 231 Mich App at 78. We reject this position because it is contrary to the express language of the statute and would lead to absurd results.

To comply with MCL 460.10w(1), Edison sold its transmission assets to International Transmission Company (ITC), a member of Midwest Independent System Operators. Edison no longer owns transmission assets, and now purchases transmission services pursu-

ant to rates set by the Federal Energy Regulatory Commission (FERC).[13]

Neither subsection MCL 460.6j nor any accounting rule prohibits an adjustment to a PSCR clause to account for transmission costs. Obviously, power must be transmitted for it to be distributed to a utility's customers. Payments made by Edison for transmission costs, which are made to comply with federal law, are necessarily "transportation costs," and therefore are properly recoverable in a PSCR clause. MCL 460.6j(1)(a). The PSC's decision to allow Edison to recover transmission costs in its PSCR proceeding is (1) within the PSC's broad ratemaking authority, *Attorney General, supra,* 231 Mich App at 79; (2) consistent with the language of Act 304 in general and MCL 460.6j in particular, *Consumers Power Co, supra* at 157 n 8, and, importantly, (3) consistent with the PSC's previous decisions and decisions of this Court.[14]

### 3. LIEEF: ASSISTANCE TO LOW-INCOME CUSTOMERS

In Act 141, the Legislature created the LIEEF and charged the PSC with administering the fund. MCL 460.10d(7) reads in pertinent part:

> If securitization savings exceed the amount needed to achieve a 5% rate reduction for all customers, then, for a period of 6 years, 100% of the excess savings, up to 2% of the electric utility's commercial and industrial revenues,

---

[13] FERC has jurisdiction over the rates, charges, and rules and regulations pertaining to transmission services pursuant to various provisions of the Federal Power Act, 16 USC 824 *et seq.*

[14] See, e.g., *Michigan Environmental Council v Pub Service Comm,* unpublished opinion per curiam of the Court of Appeals, issued May 11, 2004 (Docket Nos. 244354, 246744), slip op at 5-6. This decision lacks precedential authority, MCR 7.215(C)(1), but we consider its analysis persuasive because it reflects judicial adoption of the PSC's interpretation of a statute that the PSC is legislatively authorized to administer.

shall be allocated to the low-income and energy efficiency
fund administered by the commission. The commission
shall establish standards for the use of the fund to provide
shut-off and other protection for low-income customers
and to promote energy efficiency by all customer classes.

In its interim order, the PSC acknowledged that upon
the issuance of interim relief Edison would no longer
have securitization savings, and therefore it approved
the inclusion of $39,858,000 in Edison's operation and
maintenance (O&M) costs to fund the LIEEF in 2004
and thereafter. In its November 23, 2004, order, the
PSC concluded that those funds could be used through-
out the state, not only to serve low-income customers in
Edison's service territory.

The AG asserts that the PSC's November 23, 2004,
order is unlawful and unreasonable because it requires
Edison's customers to provide monies for the LIEEF
that will not be used in Edison's service territory which
serves no rational purpose. We disagree.

Relevant statutes refer to "the" LIEEF, which
strongly suggests that the Legislature intended to cre-
ate a single fund.[15] Moreover, no statutory language
limits the use of a utility's funds to that utility's service
territory. Further, the fact that only Edison and Con-
sumers Energy had one million or more retail custom-
ers as of May 1, 2000, and thus were the only electric
utilities required to reduce rates pursuant to MCL
460.10d(1) and (2), and so contribute securitization
savings to the LIEEF, supports the PSC's conclusion
that securitization savings contributed to the LIEEF by
Edison and Consumers could be used throughout the
state. Because the PSC's interpretation of the authoriz-

---

[15] The use of the word "the" designates a definite object. See *Hashem
v Les Stanford Oldsmobile, Inc*, 266 Mich App 61, 79; 697 NW2d 558
(2005).

ing legislation is reasonable, it is entitled to deference. *Attorney General, supra,* 237 Mich App at 88; *Champion's Auto Ferry, supra.*

We also reject the AG's argument that the PSC's order should be reversed because, in the AG's view, the decision to fund the LIEEF through Edison's O&M costs is unwise. A court's function is simply to apply the public policy promulgated by the Legislature, not to rule on the wisdom of social policy.[16] *Hanson v Mecosta Co Rd Comm'rs,* 465 Mich 492, 504; 638 NW2d 396 (2002).

#### 4. FUNDING OF RENEWABLE ENERGY PROGRAM

The PSC maintains that MCL 460.10b(1) and MCL 460.10r(6) empower the PSC to grant Edison the authority to impose a charge of $0.05 a meter, each month, to pay for the cost of Edison's renewable energy program (REP). MCL 460.10b(1) authorizes the PSC to "establish rates, terms, and conditions of electric service that promote and enhance the development of" new energy technologies. MCL 460.10r(6) empowers the PSC to establish a REP designed to inform customers of the availability of and the value of using renewable power, to promote the use of existing sources of renewable power, and to encourage the development of new sources of such power.

The AG acknowledges that the Legislature authorized the PSC to establish a REP designed to achieve the aforementioned objectives. However, the AG argues here, as it successfully maintained in *Attorney General v Pub Service Comm,* 269 Mich App 473; 713 NW2d 290

---

[16] We do not mean to suggest by this that we in fact question the wisdom of this specific policy. Instead, we simply reiterate that this is not the judiciary's role.

(2006), that the PSC lacked the statutory authority to empower Edison to impose an additional charge of $0.05 a meter each month on all customers (whose rates were not capped) to subsidize the cost of Edison's REP. We agree.

In *Attorney General v Pub Service Comm, supra,* 269 Mich App 473, another panel of this Court ruled that because neither MCL 460.10b(1) nor MCL 460.10r(6) specifically authorized the PSC to enable a utility to compel all customers to pay a surcharge to support a voluntary REP, the PSC "exceeded its authority in concluding to the contrary":[17]

> We hold that the PSC lacked the statutory authority to authorize CEC to impose an additional charge of $0.05 a meter each month on all customers, including customers who had not agreed to pay a premium to receive green power, to finance the development of renewable resource power programs. The PSC established a renewable energy program, as required by MCL 460.10r(6). The PSC's authority to set rates that facilitate the development of new energy technologies is set out in MCL 460.10b(1); however, that authority does not include the power to make management decisions on behalf of a utility. *Union Carbide Corp v Pub Service Comm,* 431 Mich 135, 148; 428 NW2d 322 (1988). The PSC's ability to consider a wide variety of factors when setting rates is well-established, *Detroit Edison Co v Pub Service Comm,* 221 Mich App 370, 375; 562 NW2d 224 (1997), but is not unlimited. MCL 460.10b(1) and MCL 460.10r(6) were enacted as part of CCERA [Act 141]. The Legislature clearly intended consumer participation in green power programs to be voluntary. Neither MCL 460.10b(1) nor MCL 460.10r(6) specifically authorizes the PSC to enable a utility to compel customers to pay to support a voluntary renewable resource energy program even if they have not chosen to receive power from the program. The PSC exceeded its authority in concluding to

---

[17] *Attorney General, supra,* 269 Mich App at 480-482.

> the contrary. [*Attorney General, supra,* 269 Mich App at
> 481-482, citing *In re Complaint of Pelland, supra.*]

This case is controlling law[18] and therefore mandates our holding that the portion of the PSC's November 23, 2004, order that authorized Edison to impose a surcharge of $0.05 a meter each month on all customers is unlawful.[19] MCL 462.26(8). Accordingly, we reverse this part of the PSC's ruling.

### B. EDISON'S APPEAL IN DOCKET NO. 264099

#### 1. CALCULATION OF WORKING CAPITAL/SHORT-TERM DEBT

In order to calculate Edison's revenue requirements, the PSC had to determine the rate of return to be applied to Edison's base rate.[20] To do this, the PSC had to determine Edison's capital structure as well as its cost of capital. The PSC rejected Edison's recommendation of a capital structure of 50 percent debt and 50 percent equity for the test year 2004 in favor of the staff's proposed structure of 54 percent debt and 46 percent equity. The PSC observed that the adoption of a 46 percent equity ratio presented a significant improvement over the 40 percent ratio approved in Edison's previous rate case, and served to balance the interests of Edison and its ratepayers.

The PSC found that Edison's long-term debt cost was 6.31 percent. The PSC rejected Edison's claim of short-

---

[18] MCR 7.215(J)(1).

[19] Indeed, our Supreme Court denied the PSC's appeal of our Court's holding and, on July 25, 2006, the PSC issued an order that implemented this Court's decision that the collection of a monthly charge of $0.05 a meter for green-power pilot costs is unlawful.

[20] The hearing referee found that Edison's base rate is $7.12 billion, and noted that at the time of the hearing, Edison had "about $3.5 billion in debt." Notice of Proposal For Decision at 14. Case No. U-11-13808.

term debt of $98.9 million at an interest rate of 2.30 percent, and instead agreed with the staff that Edison carried $279 million in short-term debt at an interest rate of 2.30 percent.

Edison argues that the PSC's November 23, 2004, order is unlawful and unreasonable because the PSC failed to reduce Edison's short-term debt or increase its working capital so that Edison's base rate, i.e., its assets, would equal its capitalization, i.e., its liabilities. Edison asserts that the PSC uses uniform accounting methods, MCL 460.556; *Attorney General v Pub Service Comm*, 262 Mich App 649, 651, 658-659; 686 NW2d 804 (2004), and determined in a previous rate case that the balance sheet method must be used for determining a utility's base rate, including working capital, in a rate case.[21] However, by adopting the staff's conclusion that Edison carried $279 million in short-term debt, the PSC found that Edison's total liabilities exceeded its assets by approximately $125 million. Edison asserts that its total working capital must be increased by $125 million, or in the alternative its short-term debt must be reduced by $125 million, so that total capitalization and

[21] In *In re Proceedings on the Appropriate Methodology to be Used, for Ratemaking Purposes, in Determining Working Capital Allowance of Regulated Gas, Electric and Telephone Utilities in Michigan*, opinion and order of the Public Service Commission, issued June 11, 1985 (Case No. U-7350), the PSC investigated which method—the formula approach, the lead/lag method, or the balance sheet method—was most appropriate for determining a working capital allowance for ratemaking purposes. The PSC determined that the balance sheet method, which "is an analysis of all of the assets of the utility to determine which are used to provide service and an analysis of all utility liabilities to determine the extent to which assets are funded by capital that is tied to the earnings of the utility," *id*. at 4, was the "most appropriate and fairest method for determining a working capital allowance," and was "to be used for all rate cases filed after the date of this order." *Id*. at 12.

total assets match. Making this adjustment would increase Edison's rates by $13.4 million. We disagree.

The staff used a six-month average to calculate Edison's short-term debt at $279 million, whereas Edison contended that a 12-month average should have been used to calculate the debt at $98.9 million. The PSC adopted the staff's method to calculate short-term debt on the ground that it was more reasonable. Edison disagrees with the PSC's conclusion, but, aside from referring to the order in a previous case, does not specify in what way the PSC's decision is unlawful, unreasonable, or not supported by the requisite evidence. Also, Edison's reliance on the order in Case No. U-7350 is misplaced. That order addressed the appropriate methodology for determining a working capital allowance, but did not fix the appropriate methodology for determining short-term debt. Edison suggests that the PSC should have adopted its calculations rather than those offered by the staff; however, the PSC was entitled to rely on the evidence provided by the staff, notwithstanding the existence of contradictory evidence. See *Great Lakes Steel Div of Nat'l Steel Corp v Pub Service Comm*, 130 Mich App 470, 481-482; 344 NW2d 321 (1983). Though this is a close question and we recognize that Edison's position has merit, because the total impact of the PSC's decision regarding Edison's base rate and capitalization is not unjust or unreasonable, and because we grant deference to the PSC, we will not interfere with the PSC's exercise of its discretion. See *Michigan Bell Tel Co v Pub Service Comm*, 332 Mich 7, 38-39; 50 NW2d 826 (1952).

## 2. RECOVERY OF CONTROL PREMIUM

As the PSC staff opined and the hearing referee recommended, we hold that the substantial savings to

Edison customers are a direct result of the acquisition of Michigan Consolidated Gas Company (MichCon) and that these synergistic savings fully justify the pass-through of the acquisition control premium. Edison seeks and is entitled to that portion of the control premium that permits Edison to accomplish these synergistic savings. We hold that Edison is clearly entitled to recover its share of the control premium that resulted in these synergistic savings. Like the hearing referee, we reject the arguments of the AG and MEC/PIRGIM in opposition to Edison's rate request regarding the control premium. Of course, the PSC should determine the precise amount of the appropriate recovery and the period over which to amortize Edison's recovery of its portion of this control premium.

In May 2001, DTE, Edison's parent company, paid $2.48 billion to acquire MCN Energy, the parent company of MichCon. DTE paid a control premium of $894 million to acquire MCN.[22] DTE allocated 66 percent, or $589 million, of the control premium to Edison on the basis of the estimated synergistic savings, i.e., the savings that arose from increased efficiency resulting from the merger, to be realized by Edison, for the benefit of Edison's customers. Therefore, in this rate case, Edison sought to recover its portion of the control premium through amortization over a period of 40 years, and accordingly requested recovery of $61.6 million for the year 2004.

---

[22] A control premium, also known as an acquisition premium, is the difference between the purchase price and the market value of the acquired company immediately before the announcement of the acquisition. See *In re Application of Michigan Gas Co*, order of the Public Service Commission, issued June 29, 1990 (Case No. U-9323), p 19 n 5. DTE paid $2.488 billion for MCN, a price that was $1.478 billion over MCN's book value. The difference between MCN's market value immediately before the announcement of the acquisition and the purchase price paid by DTE was $894 million.

Though the hearing referee rejected Edison's request for $61.6 million, he recommended inclusion of $46.2 million in Edison's rates for 2004, which is the amount the PSC staff recommended. The PSC staff and the hearing referee both opined that the synergistic savings fully justify Edison's recapture of its share of the control premium. The hearing referee concluded that Edison introduced substantial, unrebutted evidence of cost savings that resulted directly from the acquisition and merger that justified the pass-through of the control premium. Though holding that recovery is justified, the hearing referee nonetheless rejected Edison's request to recover the control premium over a 40-year amortization period because he opined, and we agree, that it would be too speculative to forecast savings over such a lengthy period. Therefore, the hearing referee concluded, and we hold, that Edison is required to substantiate savings in its next rate case in order to continue recovering the control premium.

The PSC determined, incorrectly in our view, that no part of the premium should be included in Edison's rates, and noted that DTE's decision to pay a premium for the acquisition of MCN was not subject to oversight and came at a time when MCN was in financial distress. Simply stated, these are not valid reasons to deny Edison the relief it seeks. The PSC's clearly erroneous decision resulted in a reduction of $46.2 million in Edison's revenue requirement for 2004, and a significant reduction of hundreds of millions in the future.

Edison maintains that the PSC's decision to disallow recovery of Edison's portion of the control premium is unlawful and unreasonable for three reasons. We agree. First, the decision ignored the substantial savings that resulted from the acquisition and merger, and, by denying recovery of the cost of the investment, denied

Edison its right to earn a reasonable rate of return on its investment in providing service. See, e.g., *Michigan Consolidated Gas Co, supra* at 640. Second, the PSC failed to apply the "net benefit" standard it articulated in a previous case[23] for determining whether Edison should be allowed to recover control premium costs. Edison's customers benefited from the acquisition in the form of lower costs resulting from acquisition-related cost savings. Third, the PSC ignored its own role in allowing the acquisition to go forward. The PSC approved a contract between Michigan Consolidated Gas Company and Exelon, a Chicago-based energy company, as a prerequisite to the Federal Trade Commission's approval of the acquisition. Thus, because the PSC was aware of the acquisition while it happened, and took no steps to register any objections, the PSC cannot now disavow its actions and deny Edison the benefit of the acquisition. See, e.g., *Consumers Energy Co v Pub Service Comm No 2*, 261 Mich App 455, 459-460; 683 NW2d 188 (2004).

Edison also asserts that the PSC's decision is not supported by competent, material, and substantial evidence on the whole record. Again, we agree. The PSC purported to question why DTE paid a premium for a company that was in financial distress, but acknowledged that it had no basis to question the appropriateness of the acquisition or the price paid by DTE for MCN. Furthermore, record evidence showed that MCN's market value reflected the diminished financial position of the company, and that the purchase price was within the range for comparable transactions. The PSC's conclusion that the acquisition provided no benefit to Edison's customers is simply unsupported by any record evidence. To the

---

[23] Case No. U-9323.

contrary, there is substantial evidence on the record that the acquisition resulted in a savings of $112.6 million in 2004. Indeed, Edison showed by clear evidence that if Edison were permitted to recover $61.6 million of the control premium, Edison's customers would realize more than $50 million in savings in 2004 alone.

Moreover, though DTE, not Edison, paid the control premium, we hold that that is not a sufficient reason to deny Edison recovery of its portion of the control premium. As the hearing referee noted, parent companies routinely incur costs and apportion those costs to subsidiaries. Further, the hearing referee properly found that Edison's customers recognized significant tangible benefits in the form of reduced expenses as a direct result of this merger. Therefore, we conclude that it is reasonable to allow Edison to recover its portion of the costs incurred to realize those savings. See *Michigan Bell Tel Co, supra* at 21-22.[24]

Similarly, we hold that Edison is entitled to recover its allocated share of the control premium. Thus, we reverse that portion of the PSC's decision denying Edison's request to recover its allocated portion of the control premium and remand this matter to the PSC for further proceedings to establish the precise amount and timing of this recovery.

### 3. ADJUSTMENT OF TEST YEAR

Edison's application for a rate increase was based on a forecasted 2004 test year. The PSC rejected Edison's test year and adopted the staff's methodology of using a

---

[24] We reject Edison's assertion that the PSC improperly disavowed the acquisition it had previously approved, at least implicitly. The PSC had no authority to approve the acquisition, *Consumers Power Co, supra* at 155, and had no role in doing so.

2002 historical test year adjusted for inflation at the rate of 2 percent annually for both 2003 and 2004.

Edison notes that the PSC's final order was not released until November 2004, a full 17 months after Edison's application was filed,[25] which postponed the effect of the rate adjustments until the end of 2004. Edison contends that the PSC's failure to adjust the staff's 2004 test year for an additional year of inflation at 2 percent, which would have increased Edison's O&M expenses by $24.6 million, is unlawful and unreasonable. We disagree.

The proceeding before the PSC combined Edison's first general rate case in more than 10 years with Edison's request to reinstate its PSCR clause. A test year used to set rates need not coincide precisely with the year that such rates are implemented. *Detroit Edison Co v Pub Service Comm,* 127 Mich App 499, 508; 342 NW2d 273 (1983). The establishment of the test year was within the PSC's discretion. There is no evidence that the PSC did not act with all appropriate dispatch. Edison has not shown by clear and satisfactory evidence that the PSC's decision not to adjust the test year for an additional year of inflation is unlawful or unreasonable. MCL 462.26(8).

### C. MEC/PIRGIM'S APPEAL IN DOCKET NO. 264131

We note at the outset of our analysis of MEC's and PIRGIM's appeal that these same plaintiffs challenged the PSC's identical determination regarding spent nuclear fuel (SNF) issues in *In re Application of Indiana Michigan Power Co,* 275 Mich App 369; 738 NW2d

---

[25] MCL 460.6a(2) directed the PSC to decide the rate case within nine months, and MCL 460.6a(3) required the PSC to file reports explaining the reason for any delay beyond those nine months.

289 (2007). In *Indiana*, we rejected each and every legal challenge MEC and PIRGIM raise here. Therefore, for the reasons and on the grounds set forth in our decision in *Indiana* and under the doctrine of collateral estoppel, we reject all of plaintiff's arguments regarding the SNF-related issues and hold that the PSC properly rejected all of MEC/PIRGIM's SNF-related challenges.

### D. ABATE'S APPEAL IN DOCKET NO. 264156

#### 1. SPECIAL MANUFACTURING CONTRACTS

Edison entered into special manufacturing contracts (SMCs) with large manufacturing customers, including General Motors Corporation, Ford Motor Company, and Chrysler Corporation. The PSC approved the SMCs[26] and allowed Edison to offer service to these large customers at a rate below what they would have paid absent these contracts.

Over time, other utilities became able to offer service to these large customers at competitive rates. To avoid seeking recovery from other customers of a portion of the loss incurred from serving the large customers,

---

[26] In its November 23, 2004, order, *supra* at 74-75, the PSC noted that in its orders approving the SMCs, Edison agreed that it

> would have the burden to demonstrate that either the prices of the special contract are justified on a cost of service basis, or that the benefits for other customers are substantial and outweigh the costs that are not recovered from the special contract customer. The Commission consistently affirmed that Detroit Edison's shareholders should expect to bear much if not all of any revenue shortfall that results from the special contracts. . . . In addition, the Commission has found that before any recovery related to these contracts, Detroit Edison would be required to demonstrate that service provided in conjunction with the contracts has not, and will not in the future, impede the development of competition in its service territory.

Edison sought to recover at least a portion of the discounts by imputing the discounts into its rates. To avoid the PSC's disallowing recovery of the discounts, as the PSC had indicated it would, the staff recommended a transitional power supply rate (TPSR) tariff for former SMC customers. The staff's proposed tariff set rates midway between those charged under the SMCs and those in Edison's regular industrial tariffs. Edison and ABATE also proposed TPSR tariffs, and ABATE proposed that all large manufacturing customers, and not just former SMC customers, be charged under the TPSR tariff.

In its November 23, 2004, order, the PSC adopted the staff's recommendation that the TPSR tariff be applied to former SMC customers only. The PSC found that the adoption of a TPSR tariff for former SMC customers only did not "violate the prohibition against discriminatory rates, as special contract customers differ in circumstance from those customers that have not been served under those contracts." The PSC reasoned that adoption of a TPSR tariff was "a rational method to mitigate the harm that other customers might endure should the special contract customers leave the system entirely."

ABATE sought a rehearing and challenged the PSC's decision to limit the applicability of the TPSR tariff to former SMC customers. In an order entered on June 30, 2005, the PSC denied the petition.

MCL 460.557(4) provides, in pertinent part:

The rates of an electric utility shall be just and reasonable and a consumer shall not be charged more or less than other consumers are charged for like contemporaneous service rendered under similar circumstances and conditions. An electric utility doing business within this state shall not, directly or indirectly by a special rate, rebate,

draw-back, or other device, charge, demand, collect, or receive from a person, partnership, or corporation, a greater or lesser compensation for a service rendered than the electric utility charges, demands, collects, or receives from any other person, partnership, or corporation for rendering, a like contemporaneous service.

ABATE argues that the PSC's adoption of a TPSR tariff limited to former SMC customers discriminates against other large manufacturing customers, and thus is unlawful under MCL 460.557(4). We disagree.

The PSC has broad ratemaking authority. See MCL 460.6. The PSC is not bound by any single ratemaking formula, and may make pragmatic adjustments when warranted by the circumstances of the particular matter before it. *Detroit Edison Co, supra*, 221 Mich App at 373-375. Rate design is legislative in nature, and we will not disturb a rate-design decision absent a showing that the decision is arbitrary, capricious, or an abuse of discretion. *Id*. at 381.

The PSC determined that in light of the rate shock that the SMC customers would experience if subjected to regular tariff rates and the possibility that these customers might therefore leave Edison's service entirely, thereby depriving Edison of a significant portion of its revenues,[27] the implementation of a TPSR tariff was a pragmatic solution. Edison rendered service to customers covered by SMCs "under similar circumstances and conditions" that differed from the conditions under which it rendered service to other large manufacturing customers and the PSC's decision to

---

[27] In an order approving the SMCs for General Motors, Ford, and Chrysler, the PSC noted that the automotive facilities covered by the contracts accounted for 9 percent of Edison's retail electric revenues. Furthermore, the evidence showed that extending the TPSR tariff to all large manufacturing customers would have decreased Edison's revenues by $10 million a year.

limit the applicability of the TPSR tariff to SMC customers continued this practice. The TPSR tariff conforms to MCL 460.557(4) in that it treats all SMC customers the same and applies the same ratemaking methodology to each of these customers.

ABATE's reliance on *City of Ishpeming v Pub Service Comm*, 370 Mich 293; 121 NW2d 462 (1963), as support for its position that the PSC erred by limiting the applicability of the TPSR tariff to SMC customers, is misplaced. In that case, the Upper Peninsula Power Company (UPPC) eliminated four separate tariffs being charged for similar service in a 10-county area, and implemented an area uniform rate. The city of Ishpeming had a contract with a successor to the UPPC, and pursuant to that contract, received electric power at a lower rate than that charged under the UPPC's new uniform tariff. The city sought to set aside the PSC's order that the UPPC implement a uniform tariff for the area. Our Supreme Court held that the PSC's order was valid, noting that the PSC "had a right and duty to eliminate discrimination" under MCL 460.557 as the statute read at that time. *Id.* at 302.

The *Ishpeming* Court's decision that the city was not entitled to continue receiving power at its former rate was based on the finding that no evidence showed that the city was entitled to rate disparities or differentials that had been in place before implementation of the uniform rate. *Id.* at 312. Here, there is simply no evidence that all large manufacturing customers would experience the same rate shock as would the SMC customers upon returning to Edison's regular tariff rates. The PSC was within its ratemaking authority to address this discrepancy by limiting the applicability of the TPSR tariff to SMC customers. *Detroit Edison Co, supra,* 221 Mich App at 373-375. The PSC's decision to

limit the applicability of the TPSR tariff to SMC customers did not violate MCL 460.557(4), and the PSC's order is not unlawful. *In re MCI Telecom Complaint, supra* at 427.

### 2. SUFFICIENCY OF THE EVIDENCE

A decision of the PSC must be supported by competent, material, and substantial evidence on the whole record, and must include findings of fact and conclusions of law that allow for appellate review. Const 1963, art 6, § 28; MCL 24.285. ABATE argues that the PSC's decision adopting the TPSR tariff violates Const 1963, art 6, § 28, MCL 24.285, and the doctrine of due process in that it is not based on competent, material, and substantial evidence on the whole record. ABATE asserts that the PSC cited no evidence to support its finding that limiting the applicability of the TPSR tariff to SMC customers did not violate MCL 460.557(4). We disagree.

The record in this case consists of more than 3,200 pages of transcript and more than 230 exhibits. To require the PSC to have set out in exhaustive detail the rationale behind every issue before it would have required the PSC to produce an opinion and order of unmanageable length and complexity. The PSC's discussion of the parties' competing proposals regarding implementation of a TPSR tariff was based on sufficient evidence in the record, and the PSC stated adequate reasons for its decision.

### E. AG'S APPEAL IN DOCKET NO. 264191

MCL 460.6j(18) provides in pertinent part:

Notwithstanding any other provision of this act, the commission may, upon application by an electric utility, set

power supply cost recovery factors, in a manner otherwise consistent with this act, in an order resulting from a general rate case. . . . If the commission sets power supply cost recovery factors in an order resulting from a general rate case:

(a) The power supply cost recovery factors shall cover a future period of 48 months or the number of months which elapse until the commission orders new power supply cost recovery factors in a general rate case, whichever is the shorter period.

(b) Annual reconciliation proceedings shall be conducted pursuant to subsection (12) and if an annual reconciliation proceeding shows a recoverable amount pursuant to subsection (15), the commission shall authorize the electric utility to defer the amount and to accumulate interest on the amount pursuant to subsection (16), and in the next order resulting from a general rate case authorize the utility to recover the amount and interest from its customers in the manner provided in subsection (15).

(c) The power supply cost recovery factors shall not be subject to revision pursuant to subsection (10).

In its application for a general rate case filed with the PSC on June 20, 2003, Edison requested interim and final rate relief, and also made the following request with respect to its PSCR clause:

11. Applicant is requesting, pursuant to Act 304, MCL 460.6j(18), that the Commission reinstate the Company's PSCR mechanism for 2004 in this case, coincident with approval of the Company's request for a mitigation adjustment to operate in tandem with the PSCR mechanism. Because it is imperative that the Company's overall revenue deficiency be considered in tandem with the reinstatement of the 2004 PSCR mechanism, Applicant requests that the PSCR clause remain suspended and that implementation of a new factor not begin until the date of the Commission order authorizing adequate and compensatory relief for the Company.

12. As stated above, Applicant requests the reinstatement of the proposed PSCR mechanism and mitigation adjustment for the period commencing with the later of January 1, 2004, or the issuance of a Commission order granting the Company's request for adequate and compensatory relief, through December 31, 2004; and subsequently, through a separate PSCR Plan and factor for the 12-month period January 1, 2005, through December 31, 2005. Pursuant to the provisions of Act 304, each PSCR factor and plan established in this case will be subject to the annual reconciliation procedures, as referenced in MCL 460.6j(18), to be conducted in this docket.

Paragraph 12 of Edison's application contained the following footnote:

As part of this proposal, Applicant is requesting that in the event a Commission order granting the necessary rate relief occurs subsequent to January 1, 2004, that the remaining months in 2004 be considered the first partial PSCR reconciliation period. Thereafter beginning with 2005, PSCR reconciliation would occur on a calendar year basis.

The PSC issued interim orders that held that Edison's PSCR clause automatically reinstated on January 1, 2004, when the rate freezes imposed by MCL 460.10d(1) expired, and granted, in part, Edison's request for interim rate relief. However, the PSC declined to act on Edison's PSCR plan at that time on the ground that the PSCR clause had been automatically reinstated.

In the proposal for decision (PFD), the hearing referee noted that Edison had stated that it anticipated filing a separate 2005 PSCR plan case by September 30, 2004,[28] and, on that basis, concluded that Edison had withdrawn its request for approval of a PSCR plan as

---

[28] Edison filed an application for a 2005 PSCR plan. The application was docketed as Case No. U-14275.

part of the general rate case. Edison denied that it had withdrawn its PSCR plan, and contended that the PSCR plan should continue to be addressed with the general rate case. Edison asserted that its filing of a PSCR plan pursuant to MCL 460.6j(18) was proper, but that the PSC had, implicitly at least, rejected that application and instead established a 2004 PSCR plan pursuant to MCL 460.6j(3)-(7).[29]

In its November 23, 2004, order, the PSC stated that it had not rejected Edison's application to establish a PSCR plan under MCL 460.6j(18). However, the PSC stated that given the hearing referee's failure to address the PSCR issues in the PFD, the PSC was left with the problem of how to fashion an appropriate remedy. Furthermore, the PSC decided that all PSCR issues not addressed could be addressed in Edison's 2004 PSCR reconciliation case, to be filed no later than March 31, 2005. Finally, the PSC directed the hearing referee in Case No. U-14275 to address whether Edison's application for a 2005 PSCR plan was permitted in light of the requirement of MCL 460.6j(18) that PSCR factors cover a period of 48 months.[30]

Edison sought rehearing of the PSC's November 23, 2004, order, and argued that its PSCR proposal was consistent with MCL 460.6j(18) and that the PSC's order was inconsistent with that statute. In its order granting in part and denying in part Edison's petition, the PSC stated:

[29] A PSCR plan filed pursuant to MCL 460.6j(3)-(7) features an annual PSCR plan setting PSCR factors for a 12-month period, a five-year forecast, and an annual reconciliation case.

[30] The AG moved to dismiss Edison's 2005 PSCR plan case on the ground that it violated MCL 460.6j(18). In an order entered on June 30, 2005, in Case No. U-14275, the PSC denied the AG's motion to dismiss. The AG's appeal from the PSC's decision is currently pending before this Court (Docket No. 265869).

The Commission concludes that it should treat Detroit Edison's request for PSCR reinstatement and establishment of PSCR base and factors to have been properly raised under Section 6j(3)-(7), rather than Section 6j(18). The Commission notes that the applicant did not present testimony to support factors that would be in effect for 48 months. Nor did any of the parties treat the PSCR base and factor issues as if they would be in effect for that period of time. Detroit Edison made it clear that it intended to file a 2005 PSCR plan case and a 2004 PSCR reconciliation case outside of this docket. Everything except the citation in its application suggests that Detroit Edison sought relief pursuant to Section 6j(3)-(7), not Section 6j(18). The Commission further notes that the published notice for this case did not specify under which subsection of Section 6j the Commission would consider Detroit Edison's request for PSCR factors. Moreover, any defect in notice has not prejudiced the parties because the issues are essentially the same, whichever subsection is used, and the parties have had ample opportunity to raise and argue issues related to the reasonableness and prudence of the projected costs and power supply. Therefore, the Commission concludes that it should grant rehearing on this issue and amend the November 23 order to reflect that the PSCR portion of that order was completed pursuant to MCL 460.6j(3)-(7).

The AG argues that the PSC's order of June 30, 2005, granting in part and denying in part Edison's petition for rehearing is unlawful because it violates MCL 460.6j(18) by allowing Edison to file annual PSCR plan cases. Edison's application for a general rate case and implementation of its PSCR clause was filed pursuant to MCL 460.6j(18). Under that statute, Edison must file annual reconciliation cases and refund over-recoveries to ratepayers, but is precluded from filing any additional PSCR plan cases or surcharging ratepayers for under-recoveries for the 48-month period. The AG contends that the PSC's erroneous conclusion that

Edison sought implementation of a PSCR clause under MCL 460.6j(3)-(7) allows Edison to file new PSCR plan cases annually and raise rates. We disagree.

The PSC's decision does not violate MCL 460.6j(18). Contrary to the AG's contention on appeal, this issue involves more than the PSC's rote application of MCL 460.6j(18). On June 20, 2003, Edison filed an application for a general rate case and, in conjunction therewith, sought reinstatement of its PSCR clause. In connection with its request for reinstatement of the PSCR clause, Edison also requested that its PSCR clause remain suspended until the PSC authorized rate relief. Edison cited MCL 460.6j(18).

However, the PSC concluded that Edison's PSCR clause automatically reinstated on January 1, 2004, when the rate freezes imposed by MCL 460.10d(1) expired. Ultimately, and after confusion engendered by unclear language in both the PFD and the PSC's November 23, 2004, order, the PSC concluded in its June 30, 2005, order granting in part and denying in part Edison's petition for rehearing that it should treat Edison's request for reinstatement and establishment of a PSCR base and factors pursuant to MCL 460.6j(3) through (7), rather than MCL 460.6j(18). This conclusion is consistent with the PSC's finding that Edison's PSCR clause was automatically reinstated.

Edison's actions in the proceedings before the PSC are consistent with the PSC's conclusion that, Edison's citation of MCL 460.6j(18) in its application notwithstanding, Edison intended to and did seek establishment of a PSCR base and factors pursuant to MCL 460.6j(3) through (7). Edison filed a separate 2005 PSCR plan case. Such a case could only proceed pursu-

ant to MCL 460.6j(3) through (7) because it was not filed in conjunction with a general rate case.[31]

Given the PSC's conclusion that Edison's PSCR clause was automatically reinstated, and Edison's act of filing a separate 2005 PSCR plan case, we conclude that Edison's citation of MCL 460.6j(18) was not controlling, and that the PSC correctly concluded that it should treat Edison's request for establishment of a PSCR base and factors as having been brought under MCL 460.6j(3) through (7). The PSC's construction of the applicable regulatory scheme is reasonable and is entitled to deference. *Champion's Auto Ferry, supra.* The PSC's decision is not unlawful, nor is it unreasonable. MCL 462.26(8).

## V. CONCLUSION

We reverse that portion of the PSC's November 23, 2004, order that authorized Edison to impose a surcharge of $0.05 a meter each month on all customers to subsidize its renewable energy program, and reverse the PSC's ruling that Edison may not recover its allocated share of the control premium, but affirm the PSC's orders in all other respects.

---

[31] The PSC's denial of the AG's motion to dismiss the 2005 PSCR plan case is consistent with the PSC's determination in this matter that Edison intended to proceed pursuant to MCL 460.6j(3) through (7).